Docket No. 01–7207.

United States Court of Appeals, Second Circuit.

Argued: Dec. 11, 2001.

Decided: Dec. 20, 2002.

Alan FRIEDMAN, Sybil Meisel, Steven Langsom, Trustees u/w/o Benjamin Meisel and Sybil Meisel, on behalf of themselves and all others similarly situated, Plaintiffs–Appellants,

v.

SALOMON/SMITH BARNEY, INC., Goldman Sachs, Merrill Lynch & Co., Inc., Credit Suisse First Boston, Corp., Morgan Stanley Dean Witter, Painewebber Inc., Natwest Securities, Deutsche Bank Alex Brown, Inc., Coburn & Meredith, Inc., Shamrock Partners Ltd., Prudential Securities Inc., Raymond James & Associates, Inc., Donaldson Lufkin & Jenrette, Legg Mason Wood Walker, Inc., Nations Banc Montgomery Securities, LLC, Lazard Freres & Co., LLC, and Morgan Keegan & Co., Defendants–Appellees.

Roger Kirby, Kirby McInerney & Squire LLP (Alice McInerney, Randall K. Berger, W. Mark Booker, on the brief) New York, NY, for Plaintiffs–Appellants.

Robert F. Wise, Jr., Davis Polk & Wardwell (John J. Clarke, Jr., Kevin Wallace, on the brief) New York, NY, for Defendants–Appellees.

Jay N. Fastow, Weil, Gotshal & Manges LLP (Adam P. Strochak, on the brief), New York, NY, for amicus curiae New York Stock Exchange, Inc.

David M. Becker, General Counsel, Securities and Exchange Commission (Meyer Eisenberg, Deputy General Counsel, Mark Pennington, Assistant General Counsel, on the brief) Washington, DC, for amicus curiae Securities and Exchange Commission.

Before OAKES and POOLER, Circuit Judges.[*]

POOLER, Circuit Judge.

Plaintiffs Alan Friedman, et al., appeal from the December 11, 2000, judgment of the United States District Court for the Southern District of New York (Naomi Reice Buchwald, *Judge*) dismissing their class action complaint pursuant to Fed. R.Civ.P. 12(b)(6). Plaintiffs alleged that defendants participated in a price-fixing scheme concerning the sale of securities in violation of federal antitrust laws. The district court correctly held, however, that defendants' action enjoys implied immunity from antitrust laws because the antitrust laws conflict with securities regulatory provisions.

## BACKGROUND

Plaintiffs are a class of retail investors who bought stock in public offerings. Plaintiffs are buyers. Defendants are underwriters and brokerage firms that manage public offerings through which they distribute shares of stock. Defendants are sellers. According to plaintiffs, defendants do not permit plaintiffs to re-sell their public offering stock during a prescribed "retail restricted period" of between 30 and 90 days after the initial offering distribution. First Am. Compl. at ¶¶ 2.b, 3. This retail restricted period occurs in the "aftermarket," which concerns any sales after the initial distribution. The re-sale of stock shortly after purchasing it in a public offering is known as "flipping." Generally, flipping causes stock prices to fluctuate—usually downward—and aftermarket sales restrictions are a form of price stabilization. According to plaintiffs, stock that institutional investors purchased from the same public offerings is not subject to aftermarket sales restrictions. *Id.* at ¶ 4. Plaintiffs also claim that defendants do not disclose the restrictions in an offering's registration statement or prospectus. *Id.* at ¶ 2.b.

Plaintiffs allege a conspiracy beginning in approximately 1990 among defendants to impose the restrictions on retail investors. According to plaintiffs, defendants

---

[*] Judge Wilfred Feinberg recused himself from consideration of this matter after oral argument took place and did not participate in this decision. Because the remaining two panel members agree on the disposition of this appeal, they act in accordance with 2d Cir. R. 0.14.

discourage flipping but do not strictly forbid the practice. Instead, defendants enforce the retail restricted period by denying stock allocations in future public offerings to retail investors who previously flipped stock. Defendants also enforce the retail restricted period by denying or restricting stock allocations or commissions to brokers whose retail customers engage in flipping. First Am. Compl. at ¶¶ 60, 63. Defendants monitor stock sales and flipping on a customer-by-customer basis through the Depository Trust Co., "a clearing house for the settlement of securities traded on all major exchanges and the NASDAQ system." *Id.* at ¶ 8.

Plaintiffs contend that defendants' practice artificially drives up the price of stock in the aftermarket by restricting the supply of shares. Plaintiffs also contend that the practice causes them to pay inflated prices for shares during the initial distribution of public offering stock. According to plaintiffs, institutional investors benefit from defendants' practice because they can re-sell their shares at a higher price in the aftermarket. First Am. Compl. at ¶ 4. Defendants also benefit from the scheme by, among other things, receiving more business and even kickbacks from institutional investors. Plaintiffs also note that defendants benefit from the artificially high prices because they do not have to spend as much of their own capital to support the price of public offering shares, and defendants attract future business based on the stock price performance of current public offerings. *Id.* at ¶ 11.e.

Plaintiffs filed a class action lawsuit in federal court on August 21, 1998, alleging a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Plaintiffs also alleged a cause of action under New York law for breach of fiduciary duty. Plaintiffs filed an amended complaint on March 10, 1999, and defendants moved to dismiss it pursuant to Rule 12(b)(6). After hearing oral argument, the district court granted defendants' motion in a Memorandum and Order in December 2000. *Friedman v. Salomon/Smith Barney, Inc.,* 2000 WL 1804719 (S.D.N.Y. Dec.8, 2000) (*"Friedman I"*). In addition to dismissing plaintiffs' federal claim on the merits, the district court dismissed their state law claim by declining to exercise supplemental jurisdiction over it. *Id.* at *12. Plaintiffs moved for reconsideration, and the district court denied the motion in a January 2001 Memorandum and Order. *Friedman v. Salomon/Smith Barney, Inc.,* 2001 WL 64774 (S.D.N.Y. Jan.23, 2001) (*"Friedman II"*). Plaintiffs now appeal. Our review is *de novo. Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994).

## DISCUSSION

Both parties agree that the only issue on appeal is whether defendants' conduct is immune from antitrust enforcement based on the regulatory authority and actions of the Securities and Exchange Commission ("SEC"), principally under Section 9(a)(6) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78i(a)(6).[1] The relevant legal doctrine is known as implied immunity. The parties also agree

---

**1.** The statute states: "It shall be unlawful for any person, directly or indirectly, by the use of the mails or any means or instrumentality of interstate commerce, or of any facility of any national securities exchange, or for any member of a national securities exchange ... [t]o effect either alone or with one or more other persons any series of transactions for the purchase and/or sale of any security registered on a national securities exchange for the purpose of pegging, fixing, or stabilizing the price of such security in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78i(a)(6).

that the SEC has not regulated price stabilization in the aftermarket, but they draw opposite inferences from this circumstance.

According to plaintiffs, defendants' conduct does not benefit from the shield of implied immunity because the SEC's failure to regulate the manipulation of stock prices in the aftermarket is not the product of its consideration of antitrust or competitive concerns, and the SEC never has implied or held that defendants' conduct was permissible. Plaintiffs also argue that because defendants' conduct is anti-competitive, applying antitrust laws would reinforce the purpose of the Exchange Act rather than subject defendants to conflicting directives of securities and antitrust laws. Defendants and *amici* contend that the SEC has exercised its statutory authority in permitting—through the deliberate absence of regulation—defendants' conduct, so punishing that same conduct under antitrust principles would create an impermissible conflict.

## I. Implied immunity

■ The doctrine of implied immunity rests on three Supreme Court cases: *Silver v. New York Stock Exch.*, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963), *Gordon v. New York Stock Exch., Inc.*, 422 U.S. 659, 95 S.Ct. 2598, 45 L.Ed.2d 463 (1975), and *United States v. National Ass'n of Sec. Dealers, Inc.*, 422 U.S. 694, 95 S.Ct. 2427, 45 L.Ed.2d 486 (1975) ("*NASD*"). Generally, courts should not abrogate antitrust laws through implied immunity, also known as implied repeal or revocation, "casually" because "repeal by implication is not favored." *Finnegan v. Campeau Corp.*, 915 F.2d 824, 828 (2d Cir.1990) (quotation marks and citation omitted). Implied immunity will exist "[o]nly where there is a plain repugnancy between the antitrust and regulatory pro-

visions." *Id.* (quotation marks and citation omitted). "[R]epeal of antitrust jurisdiction cannot be implied simply when the antitrust laws and a regulatory scheme overlap." *Strobl v. New York Mercantile Exch.*, 768 F.2d 22, 27 (2d Cir.1985). Importantly, the "plain repugnancy," or conflict, between antitrust and securities laws extends to potential as well as actual conflicts. *Id.*

As the district court below recognized, implied immunity analysis requires a fairly fact-specific inquiry into the nature and extent of regulatory action that allegedly conflicts with antitrust law. *See Friedman I*, 2000 WL 1804719, at *4–5 (listing relevant factors to implied immunity analysis). In their arguments on appeal, the parties largely compare the case at bar to the facts of prior cases, making a brief review of those cases helpful here.

In *Finnegan*, we found implied immunity where a direct conflict existed between antitrust law, which would prohibit joint takeover bidders, and the Williams Act, 15 U.S.C. §§ 78m(d)-(e) & 78n(d)-(f), which allowed competing bidders to make joint bids as long as they complied with SEC disclosure regulations. *Finnegan*, 915 F.2d at 829–31. In light of the direct conflict, implied immunity was necessary for the "proper functioning of the securities laws." *Id.* at 831. In *Finnegan*, we held that "[w]e cannot presume that Congress has allowed competing bidders to make a joint bid under the Williams Act and the SEC's regulations and taken that right away by authorizing suit against such joint bidders under the antitrust laws." *Id.* at 830.

In *Strobl*, we found that no implied immunity existed where both the Sherman Act and Commodity Exchange Act forbid price manipulation, although the Sherman Act called for greater damages. *Strobl*, 768 F.2d at 27–28. Key to that decision

was the absence of conflict or repugnancy between the legal schemes and the fact that "[t]here is no built-in balance in the regulatory scheme of the [Commodity Exchange] Act that permits a little price manipulation in order to further some other statutory goal." *Id.* at 28. Thus, both sets of laws had the same goal and considered the same factors to reach that goal. Note that the Exchange Act, which governs our decision here, differs from the Commodity Exchange Act because the former allows "a little price manipulation" to further goals such as efficiently raising capital through new issues. *See* 15 U.S.C. § 78i(a)(6); *see also* S.Rep. No. 34–792, at 8–9, 17 (1934), SEC Release No. 34–2446, at 10–11 (March 18, 1940).

In NASD, the Supreme Court found implied immunity where the Investment Company Act of 1940, 15 U.S.C. § 80a–22(f), gave the SEC power to authorize sales and distribution restrictions on the transfer of mutual fund shares in secondary markets even though the same restrictions were anti-competitive under the antitrust laws. *NASD,* 422 U.S. at 729–30, 95 S.Ct. 2427. The facts in NASD are analogous to the case at bar because the statute in NASD "authorizes funds to impose transferability or negotiability restrictions, subject to [SEC] disapproval." *Id.* at 726, 95 S.Ct. 2427. Here, Section 9(a)(6) of the Exchange Act authorizes price stabilization mechanisms subject to SEC disapproval. 15 U.S.C. § 78i(a)(6). The Supreme Court found that "[t]here can be no reconciliation of [the SEC's] authority under Section 22(f) to permit these and similar restrictive agreements with the Sherman Act's declaration that they are illegal per se," even though the SEC had not specifically approved the restrictive agreements. *Id.* at 729–30, 95 S.Ct. 2427.

In *Gordon,* the Supreme Court found implied immunity where the SEC under Section 19(b) of the Exchange Act, 15 U.S.C. § 78s(b), had jurisdiction to establish a system of fixed commission rates on the New York Stock Exchange. *Gordon,* 422 U.S. at 691, 95 S.Ct. 2598. The Court did not concern itself with the "wisdom of fixed rates" but considered only Congress' intent that the SEC and not antitrust laws address the issue. *Id.* at 688, 95 S.Ct. 2598. Again, the Court focused on conflict, holding that "different standards are likely to result because the sole aim of antitrust legislation is to protect competition, whereas the SEC must consider, in addition, the economic health of the investors, the exchanges, and the securities industry." *Id.* at 689, 95 S.Ct. 2598.

In contrast to *Gordon* and *NASD,* in the earlier case *Silver* the Supreme Court found no implied immunity because applying antitrust principles to New York Stock Exchange rules that lay outside the SEC's jurisdiction created no conflict. *Silver,* 373 U.S. at 358, 83 S.Ct. 1246. Because the Exchange Act at that time did not give the SEC power to "review particular instances of enforcement of exchange rules," *id.* at 357, 83 S.Ct. 1246, applying the antitrust laws to effect that review did not affect the function of the Exchange Act, particularly because nothing in the SEC regulatory scheme at the time performed the "antitrust function" of considering injuries to competition. *Id.* at 358–59, 83 S.Ct. 1246. The Court noted that if the SEC had jurisdiction over review of exchange rules "a different case as to antitrust exemption would be presented." *Id.* at 360, 83 S.Ct. 1246. After *Silver* was decided, Congress amended the Exchange Act to require the SEC to take competition, among other things, into account in rulemaking and when reviewing rules of exchanges. *See* 15 U.S.C. §§ 78c(f), 78w(a)(2).

■ Thus, implied immunity exists where allowing an antitrust lawsuit to pro-

ceed would conflict with Congress's implicit determination that the SEC should regulate the alleged anti-competitive conduct. In other words, implied immunity exists where allowing parallel proceedings on antitrust and SEC tracks would subject defendants to conflicting mandates. The source of the conflict may, but need not, involve affirmative SEC action. Conflict also can exist where the SEC has jurisdiction over the challenged activity and deliberately has chosen not to regulate it. *Strobl*, 768 F.2d at 27.

## II. Application of legal standard

■ In a thorough and comprehensive opinion, the district court found that implied immunity existed here because (1) the SEC has exclusive jurisdiction over price stabilization pursuant to Section 9(a)(6), which allows stabilization practices not specifically prohibited by the SEC; (2) Congress was aware of stabilization practices when it passed the Exchange Act and created the SEC in 1934; (3) the SEC actively studied and regulated stabilization practices over the last 60 years and consistently made a "studied assessment that the benefits of price stabilization to the capital markets outweigh the admitted anti-competitive aspects of stabilizing manipulation;" and (4) there is a clear conflict between plaintiff's reading of antitrust laws and SEC regulation under Section 9(a)(6). *Friedman I*, 2000 WL 1804719, at *11–12; *Friedman II*, 2001 WL 64774, at *1. These holdings rest on proper interpretation of Section 9(a)(6) and analysis of the history of SEC regulation of price stabilization practices.

We examine briefly the SEC's regulation of price stabilization in both the distribution and aftermarket phases of public offerings. As noted previously, at the time Congress passed the Exchange Act, it declined to prohibit pegging, fixing or stabi-

lizing practices outright and instead gave the SEC authority to regulate them. In 1940, the SEC issued its first policy statement about the practices, did not prohibit stabilization during distribution, and adopted regulations in an attempt to balance the interests of individual investors and "protection of the nation's credit and banking structure and the health of its capital markets." SEC Release No. 34–2446, at 10, 14. The SEC acknowledged that stabilization, "broadly defined as the buying of a security for the limited purpose of preventing or retarding a decline in its open market price in order to facilitate its distribution to the public," was a longstanding market practice with some "vicious and unsocial aspects" requiring additional monitoring in light of the new regulations. *Id.* at 3, 14. The SEC also pointed out that stabilization tended to combat the serious problem of flipping. *Id.* at 5.

In 1955 and 1963, the SEC revisited the stabilization issue and modified existing regulations but did not prohibit the practice. *See* SEC Release No. 34–5194 (July 5, 1955); H.R. Doc. No. 95, Pt. 1 (1963). In its 1963 report to Congress, the SEC pointed out that various firms combated flipping by depriving salespeople of their commissions "if resales by customers occur within 30 days of the effective date," by identifying "customers who sold stock in the immediate after-market" and declining to give these customers "allotments of subsequent oversubscribed issues," and telling customers "not to sell for varying periods, usually 30 or 60 days." H.R. Doc. No. 95, Pt. 1, at 525–26. The SEC nonetheless declined to regulate or prohibit the practices.

More recently, the SEC in 1994 undertook a comprehensive review of its trading practice rules and posed several questions dealing specifically with flipping in the af-

termarket and whether a need existed to regulate the practice. SEC Release Nos. 33–7057, 34–33924, at 1316–17 (April 19, 1994). The SEC rule that resulted from this inquiry did *not* regulate price stabilization in the aftermarket. *See* 17 C.F.R. § 242.104 ("Regulation M"). In its release describing its new regulation, the SEC noted that stabilization in the aftermarket to combat flipping was "not uncommon and may act to support the price of the offered security in the aftermarket." SEC Release Nos. 33–7282, 34–37094, at 1740 (April 11, 1996). The commenters were "divided" over whether to regulate stabilization in the aftermarket, and the SEC chose instead to gather information, monitor aftermarket practices and "assess[ ] whether further regulation is warranted." *Id.*

Defendants argue that this history demonstrates that the SEC studied price stabilization and flipping repeatedly yet made the administrative judgment not to regulate the practices of which plaintiffs complain. Plaintiffs dispute the import of this history. First, plaintiffs argue that price stabilization in the aftermarket is a recent phenomenon beginning in the 1990s, so there is no way that Congress in 1934 or the SEC until just recently could have studied the issue. Thus, plaintiffs contend, the history we recounted above is essentially meaningless. We disagree. Plaintiffs rely on an artificial distinction between price stabilization in the aftermarket and price stabilization during distributions. There is no question that underwriters and brokers consistently employed some form of price stabilization to deter flipping. The practice pre-dated the Exchange Act and the SEC. As technology has evolved and distributions have taken shorter and shorter periods of time, the problem of flipping—and its "solution" of price stabilization—simply has spilled into the aftermarket as well as the distri-

bution period. The SEC explicitly recognized this trend in its 1994 release, when it stated that " 'stabilization' of the market in connection with offerings may have shifted from the sales period to the aftermarket period." SEC Release Nos. 33–7057, 34–33924, at 1316. The SEC still declined to regulate price stabilization in the aftermarket when it adopted Regulation M, and we find this decision to be both deliberate and significant. Plaintiffs cannot contend that this latest action concerned only distributions and not the aftermarket.

Second, plaintiffs claim that no conflict exists here because application of antitrust laws would reinforce the Exchange Act's hostility to price manipulation. Plaintiffs argue that the SEC has not considered the antitrust implications of price stabilization. However, the agency must consider the competitive effects of its regulations. *See* 15 U.S.C. §§ 78c(f), 78w(a)(2). Contrary to plaintiffs' contention, this case is unlike *Strobl,* where both the securities and antitrust laws imposed a categorical prohibition on price manipulation, *Strobl,* 768 F.2d at 28, because here Section 9(a)(6) requires the SEC to consider other factors such as the public interest and protection of investors in addition to market competition. The SEC has considered these factors in deciding not to regulate price stabilization in the aftermarket. Moreover, because Section 9(a)(6) permits some forms of price stabilization, it conflicts with the antitrust laws' blanket prohibition of the practices. The SEC also indicated in its 1940 release that its power to regulate stabilizing under the Exchange Act was broad and exclusive and that anti-competitive practices were lawful in the absence of SEC regulation. SEC Release No. 34–2446, at 12–14. The agency was aware of the antitrust implications of stabilization practices and the potential for direct conflict.

Third, plaintiffs argue repeatedly that the SEC has specifically declined to regulate the aftermarket and the absence of this regulation means that courts can enforce the antitrust laws against defendants without the danger of a conflict. Plaintiffs also contend that the possibility of future SEC aftermarket regulation is insufficient to sustain a finding of implied immunity. Plaintiffs' argument rests on a misinterpretation of Section 9(a)(6), which the district court addressed in its order denying plaintiffs' motion for reconsideration. On that motion and on appeal, plaintiffs argue that the district court misread the "plain words" of Section 9(a)(6) and "turned [the section] on its head by an interpretation directly opposite its plain meaning." It is plaintiffs that have given an opposite meaning to Section 9(a)(6).

The statute clearly provides that price stabilization in contravention of SEC regulations is unlawful. 15 U.S.C. § 78i(a)(6). As the district court correctly found, the statute allows price stabilization practices that the SEC does not prohibit. *Friedman II*, 2001 WL 64774, at *1. Plaintiffs reach the opposite conclusion—that the statute prohibits all price stabilization practices that the SEC does not specifically allow—because only this interpretation permits plaintiffs to construe the SEC's failure to regulate the aftermarket as leaving a space for antitrust laws to fill. Plaintiffs' misinterpretation of Section 9(a)(6) is the core of their position on appeal because all of their arguments against implied immunity flow from this view of the statute. But once the correct interpretation of Section 9(a)(6) is in place—the interpretation that the district court and defendants espouse—a finding of implied immunity is the direct consequence. We therefore affirm the district court's ruling that implied immunity bars plaintiffs' challenge to price stabilization practices in the aftermarket.

## CONCLUSION

For the forgoing reasons, we affirm the judgment below in its entirety. Because we hold that implied immunity bars plaintiffs' claim, we do not reach defendants' alternative argument that the complaint alleges no antitrust injury because plaintiffs bought their shares at the same price as institutional investors and are free to sell them in the aftermarket.