**In re INITIAL PUBLIC OFFERING ANTITRUST LITIGATION**

No. 01 Civ.2014(WHP), 01 Civ.11420(WHP).

United States District Court, S.D. New York.

Nov. 3, 2003.

Christopher Lovell, Lovell Stewart Halebian LLP, New York, New York, for Plaintiffs.

Melvyn I. Weiss, Ariana J. Tadler, Milberg Weiss Bershad Hynes & Lerach LLP, New York, New York, for the Sherman Act Plaintiffs.

Russel H. Beatie, Beatie and Osborn LLP, New York, New York, for the Robinson–Patman Act Plaintiffs.

Richard A. Cirillo, King & Spalding, New York, New York, for Defendant Credit Suisse First Boston.

Gandolfo V. DiBlasi, Sullivan & Cromwell, New York, New York, for Defendant The Goldman Sachs Group, Inc.

Moses Silverman, Paul, Weiss, Rifkind, Wharton & Garrison, New York, New York, for Defendant Lehman Brothers, Inc.

James Benedict, Jon Roellke, Clifford Chance Rogers & Wells LLP, New York, New York, for Defendant Merrill Lynch, Pierce, Fenner & Smith, Inc.

Steven G. Bradbury, Kirkland & Ellis, Washington, D.C., for Defendant Morgan Stanley Dean Witter & Co.

Andrew J. Frackman, O'Melveny & Myers LLP, New York, New York, for Defendant Robertson Stephens, Inc.

Robert B. McCaw, Wilmer, Cutler & Pickering, New York, New York, for Defendant Salomon Smith Barney, Inc.

Barry R. Ostrager, David W. Ichel, Simpson Thacher & Bartlett, New York, New York, for Defendant J.P. Morgan Securities Inc.

Randy M. Mastro, John A. Herfort, Gibson, Dunn & Crutcher LLP, New York, New York, for Defendant Bear, Stearns & Co., Inc.

Joel M. Mitnick, Sidley Austin Brown & Wood LLP, New York, New York, for Defendant Deutsche Bank Securities Inc.

John D. Donovan, Ropes & Gray, Boston, Massachusetts, for Defendants Fidelity Distributors Corp. Fidelity Brokerage Services LLP Fidelity Investments Institutional.

W. Hans Kobelt, Pollack & Kaminsky, New York, New York, for Defendant Janus Capital Corp.

Scott E. Mortman, Mayer, Brown & Platt, New York, New York, for Defendant Comerica, Inc. d/b/a Munder Capital Management.

Kevin C. Logue, Paul, Hastings, Janofsky & Walker LLP, New York, New York, for Defendants Van Wagoner Capital Management, Inc. Van Wagoner Funds, Inc.

## MEMORANDUM AND ORDER

PAULEY, District Judge.

In this consolidated class action, two putative classes of plaintiffs seek redress for alleged antitrust injuries suffered as a result of purchasing initial public offering ("IPO") shares of certain technology-related securities (the "Class Securities") at artificially-inflated prices during the "dot-com boom" of the late 1990s. The first putative class (the "Sherman Act Plaintiffs") alleges violations of the Sherman Act, 15 U.S.C. § 1 *et seq.*, and various state antitrust laws, by ten investment banks that underwrote the majority of the technology-related IPOs during this peri-od.[1] The second putative class (the "Robinson–Patman Act Plaintiffs") alleges that these same practices, as well as those favoring long-term investors, constitute commercial bribery under Section 2(c) of the Robinson–Patman Act, 15 U.S.C. § 13(c).

Currently pending before this Court is the Underwriter Defendants' consolidated motion, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss this action. For the reasons set forth below, their motion is granted on the ground that the conduct alleged by the Sherman Act Plaintiffs and the Robinson–Patman Act Plaintiffs is impliedly immune from antitrust scrutiny. Any other result would force the defendants to navigate the Scylla of securities regulation and Charybdis of antitrust law.

## BACKGROUND

### I. The Sherman Act Allegations

The gravamen of the Sherman Act Plaintiffs' Consolidated Amended Class Action Complaint (the "Sherman Act Complaint" or "Sherman Act Compl.") is that the Underwriter Defendants conspired to inflate the aftermarket prices of the Class Securities by using the fixed price equity underwriting system (the "syndicate system") to foist anticompetitive charges, as well as impermissible aftermarket "laddering" and "tie-in" arrangements, on direct purchasers of IPO shares in violation of federal and state antitrust laws. (Sherman Act Compl. ¶ 1.)

Specifically, the Sherman Act Plaintiffs allege that the Underwriter Defendants: (1) "required customers to pay ... the IPO price for the relevant Class Security plus additional anticompetitive charges"

---

1. The ten "Underwriter Defendants" are Bear, Stearns & Co., Inc., Credit Suisse First Boston Corp., Deutsche Bank Alex. Brown, Goldman Sachs & Co., J.P. Morgan Chase & Co., Lehman Brothers, Inc., Merrill Lynch, Pierce, Fenner & Smith, Inc., Morgan Stanley & Co., Inc., Robertson Stephens, Inc. and Solomon Smith Barney, Inc.

(Sherman Act Compl. ¶ 4(a)); (2) "required customers to agree, in order to obtain IPO shares of Class Securities, to make 'tie-in purchases' of such Class Securities in the aftermarket at levels above the respective IPO prices," a process known as "laddering," in order to artificially inflate the aftermarket prices of the IPOs (Sherman Act Compl. ¶¶ 4(b), 6–7; and (3) utilized the preexisting syndicate system to implement and further their antitrust conspiracy, through, *inter alia*, "road shows"[2] and other information sharing activity (Sherman Act Compl. ¶ 5). The anticompetitive activity alleged includes, *inter alia*, "non-competitively determined commissions on the purchase and sale of other securities, purchases of an issuer's shares in the follow-up or 'secondary' public offerings (for which the underwriters would earn underwriting discounts), commitments to purchase other, less attractive securities, or the laddered purchases." (Sherman Act Compl. ¶ 6.)

According to the Sherman Act Plaintiffs, the purpose and effect of this conspiracy was to: (1) increase the consideration that aftermarket purchasers paid for the Class Securities above the levels that would have existed in a competitive market (Sherman Act Compl. ¶¶ 7–8, 70–74); and (2) create artificial demand for the Class Securities, thereby inflating their price with a con-comitant increase in underwriting charges, commissions, and investment banking fees. (Sherman Act Compl. ¶¶ 70–74.) The Sherman Act Plaintiffs also allege violations of various state antitrust laws based on the same conduct. (Sherman Act Compl. ¶¶ 84–109.)

## II. *The Robinson–Patman Act Allegations*

The Robinson–Patman Act Plaintiffs allege violations of Section 2(c) of the Robinson–Patman Act, 15 U.S.C. § 13(c), by most of the Underwriter Defendants, as well as certain institutional investors.[3] In their complaint (the "Robinson–Patman Act Complaint" or "Robinson–Patman Act Compl."), the Robinson–Patman Act Plaintiffs allege the same conduct as the Sherman Act Plaintiffs (Robinson–Patman Act Compl. ¶¶ 56–63, 90, 107–115), but add allegations that the Underwriter Defendants favored long-term investors over "flippers"[4] when allocating "hot issue" IPO shares. (Robinson–Patman Act Compl. ¶¶ 64–71, 74–89.) According to the Robinson–Patman Act Plaintiffs, this preferential treatment "tends to assure an excess of purchasers over sellers and to drive the market price of the securities upward." (Robinson–Patman Act Compl. ¶ 67.) The Robinson–Patman Act Plaintiffs further al-

---

2. A "road show" is defined by the NASD as a "series of meetings with potential investors in key cities, designed and performed by a company and its investment banker as the company prepares to go public." NASD: Resources—Glossary, *at* http://www.nasd.com/resources/glossary/r.asp. *See also Sandstad v. CB Richard Ellis, Inc.,* 309 F.3d 893, 895 n. 1 (5th Cir.2002) (The "road show" process is "[a] series of presentations to investors describing an upcoming issue of securities. A road show is designed to drum up interest in the issue among potential investors.") (quoting David L. Scott, *Wall Street Words* 326 (Revised ed.1997)).

3. The "Institutional Defendants" in the Robinson–Patman Act Complaint are Fidelity Distributors Corporation, Fidelity Brokerage Services LLC, Fidelity Investments Institutional Services Co., Janus Capital Corporation, Comerica, Inc., Van Wagoner Capital Management, Inc., and Van Wagoner Funds, Inc.

4. A "flipper" is defined in the Robinson–Patman Act Complaint as a "customer who sells his allocation of securities within twenty-four to forty-eight hours after purchasing them on the effective date of the offering." (Robinson–Patman Act Compl. ¶ 64.)

lege that the Institutional Defendants agreed not to "flip" their shares in exchange for favorable IPO allocations, and paid or received money for such allocations. (Robinson–Patman Act Compl. ¶¶ 24–35, 74–89, 116–26.) According to the Robinson–Patman Act Plaintiffs, these combined actions violate the commercial bribery prohibitions of Section 2(c) of the Robinson–Patman Act, 15 U.S.C. § 13(c).

## DISCUSSION

The Underwriter Defendants move to dismiss both the Sherman Act Complaint and Robinson–Patman Act Complaint on the grounds that: (1) the conduct alleged is immune from attack under federal and state antitrust laws; (2) plaintiffs lack antitrust standing; (3) plaintiffs' conclusory allegations of conspiracy are insufficient to state a valid claim; (4) plaintiffs fail to allege a relevant market; and (5) plaintiffs' state law claims are fatally defective. This Court's inquiry begins and ends with the doctrine of implied immunity.

## I. Standards For A Motion To Dismiss

On a motion to dismiss, a court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in a plaintiff's favor.[5] *Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP,* 322 F.3d 147, 158 (2d Cir.2003). A court should not dismiss a complaint for failure to state a claim unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *accord Jaghory v. New York State Dep't of Educ.,* 131 F.3d 326, 329 (2d Cir.1997).

"This generous approach to pleading applies in the antitrust context." *Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton Coll.,* 128 F.3d 59, 63 (2d Cir.1997). Indeed, "[i]n antitrust cases in particular, the Supreme Court has stated that 'dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly.'" *George Haug Co. v. Rolls Royce Motor Cars, Inc.,* 148 F.3d 136, 139 (2d Cir.1998) (quoting *Hosp. Bldg. Co. v. Trs. of Rex Hosp.,* 425 U.S. 738, 746, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976)). However, a Court must not "assume that the [plaintiff] can prove facts that it has not alleged or that the defendants have violated the antitrust laws in ways that have not been alleged." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters,* 459 U.S. 519, 526, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983).

"Finally, a complaint can be dismissed for failure to state a claim pursuant to a Rule 12(b)(6) motion raising an affirmative defense 'if the defense appears on the face of the complaint.'" *Color Tile,* 322 F.3d at 158 (quoting *Pani v. Empire Blue Cross Blue Shield,* 152 F.3d 67, 74 (2d Cir.1998)). Defendants' assertion of implied immunity is an affirmative defense that appears on the face of the complaint, and as such is

---

5. Further, "[i]n deciding a Rule 12(b)(6) motion, the Court may consider the following materials: (1) facts alleged in the complaint and documents attached to it or incorporated in it by reference, (2) documents 'integral' to the complaint and relied upon in it, even if not attached or incorporated by reference, (3) documents or information contained in defendant's motion papers if plaintiff has knowledge or possession of the material and relied on it in framing the complaint, (4) public disclosure documents required by law to be, and that have been, filed with the Securities and Exchange Commission, and (5) facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence." *In re Merrill Lynch & Co., Inc.,* 273 F.Supp.2d 351, 356–57 (S.D.N.Y.2003) (internal citations omitted).

properly addressed at the motion to dismiss stage. *In re Stock Exch. Options Trading Antitrust Litig.*, 317 F.3d 134, 150–53 (2d Cir.2003) (*"Stock Exchanges Options"*) ("Although the doctrine of implied repeal is sometimes described in terms of the district court's 'antitrust jurisdiction,' we think it is more properly viewed as conferring an immunity that is an affirmative defense.") (internal citation omitted).

## II. *The Doctrine Of Implied Immunity*

■ The doctrine of implied immunity is grounded in the shibboleth that Congress does not intentionally vitiate its own regulatory mandates, and therefore "antitrust laws do not come into play when they would prohibit an action that a regulatory scheme permits." *Finnegan v. Campeau Corp.*, 915 F.2d 824, 827 (2d Cir.1990). At the intersection of securities regulation and antitrust law, the doctrine of implied immunity provides that federal securities laws impliedly repeal the Sherman Act with respect to certain conduct, and confer immunity from liability under the antitrust laws for that conduct. The doctrine, and the analytical framework to determine whether it applies in a particular situation, springs from a trilogy of Supreme Court opinions. *See United States v. Nat'l Ass'n of Sec. Dealers, Inc.*, 422 U.S. 694, 95 S.Ct. 2427, 45 L.Ed.2d 486 (1975) (*"NASD"*); *Gordon v. New York Stock Exch., Inc.*, 422 U.S. 659, 95 S.Ct. 2598, 45 L.Ed.2d 463 (1975); *Silver v. New York Stock Exch.*, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963).

*Silver*, the earliest of the cases, involved an antitrust challenge to a New York Stock Exchange ("NYSE") order enforcing an internal rule prohibiting direct communications with non-member firms. *Silver*, 373 U.S. at 343–44, 83 S.Ct. 1246. The Supreme Court held that the Securities Exchange Act of 1934, 15 U.S.C. § 78a, *et seq.* (the "Exchange Act"), did not impliedly repeal the antitrust laws with respect to this NYSE order because the Securities and Exchange Commission (the "SEC" or the "Commission") lacked jurisdiction "to review particular instances of enforcement of exchange rules." 373 U.S. at 364–67, 83 S.Ct. 1246. The Court determined that, given the SEC's lack of authority over internal NYSE rules, there was no potential for conflict between the SEC's regulatory power and the antitrust laws, *Silver*, 373 U.S. at 358, 83 S.Ct. 1246, and that "there was a need for applicability of the antitrust laws, for if those laws were deemed inapplicable the challenged conduct would be unreviewable," *Stock Exchanges Options*, 317 F.3d at 145 (discussing *Silver*, 373 U.S. at 358–59, 83 S.Ct. 1246). The Court noted, however, that "[s]hould review of exchange self-regulation be provided through a vehicle other than the antitrust laws, a different case as to antitrust exemption would be presented." *Silver*, 373 U.S. at 360, 83 S.Ct. 1246.

Recently, the Second Circuit noted that *Gordon*, decided more than a decade after *Silver*, was such a "different case." *Stock Exchanges Options*, 317 F.3d at 145. *Gordon* examined the practice of securities exchanges and their members employing fixed commission rates. 422 U.S. at 660–61, 95 S.Ct. 2598. The Supreme Court held that implied immunity was warranted because the SEC had expansive regulatory authority over commission rate practices, which it had exercised actively. *Gordon*, 422 U.S. at 690, 95 S.Ct. 2598 ("Although SEC action in the early years appears to have been minimal, it is clear that since 1959 the SEC has been engaged in deep and serious study of the commission rate practices of the exchanges and of their members. . . ."). The Court reasoned that even though the fixing of commission rates was prohibited by both the securities laws

and antitrust laws at the time the case was heard, the SEC had the statutory authority to permit such conduct in the future should it choose to do so. *Gordon,* 422 U.S. at 690–91, 95 S.Ct. 2598. Thus, "[i]f antitrust courts were to impose different standards or requirements, the exchanges might find themselves unable to proceed without violation of the mandate of the courts or of the SEC." *Gordon,* 422 U.S. at 689, 95 S.Ct. 2598.

The regulatory conflict in *Gordon* was more than theoretical because of the distinct mandates of the securities and antitrust laws. "Such different standards are likely to result because the sole aim of antitrust legislation is to protect competition whereas the SEC must consider, in addition, the economic health of the investors, the exchanges, and the securities industry." *Gordon,* 422 U.S. at 689, 95 S.Ct. 2598. The Court concluded that, as a result, the "[i]nterposition of the antitrust laws, which would bar fixed commission rates as *per se* violations of the Sherman Act, in the face of positive SEC action, would preclude and prevent the operation of the Exchange Act as intended by Congress and as effectuated through SEC regulatory activity." *Gordon,* 422 U.S. at 691, 95 S.Ct. 2598. Thus, "failure to imply repeal would render nugatory the legislative provision for regulatory agency supervision of exchange commission rates." *Gordon,* 422 U.S. at 691, 95 S.Ct. 2598.

In *NASD,* decided the same day as *Gordon,* the Court determined that Congress' grant of regulatory authority to the SEC was "sufficiently pervasive" to confer on the defendants immunity from antitrust liability for activities restricting the transferability of mutual fund shares in the secondary market. *NASD,* 422 U.S. at 732, 95 S.Ct. 2427. Although the Court found that the NASD's agreement to restrict the sale of mutual fund shares and

fix their prices in the secondary market was not explicitly authorized under Section 22(f) of the Investment Company Act of 1940 (the "1940 Act"), 15 U.S.C. § 80a–22(f), Section 22(f) did authorize funds to impose transferability or negotiability restrictions subject to SEC disapproval. *NASD,* 422 U.S. at 729–30, 95 S.Ct. 2427. Further, the Court held that the combination of the Maloney Act, 15 U.S.C. § 78o–3, and the 1940 Act conferred upon the SEC "broad regulatory authority ... to monitor the activities [at issue], and the history of [SEC] regulations suggests no laxity in the exercise of this authority. To the extent that any of [defendants'] ancillary activities frustrate the SEC's regulatory objectives it has ample authority to eliminate them." *NASD,* 422 U.S. at 734, 95 S.Ct. 2427. Thus, the "pervasive regulatory scheme" created by the 1940 Act and the Maloney Act, which permitted transferability restrictions unless prohibited by the SEC, necessitated a finding of implied immunity. *NASD,* 422 U.S. at 732, 95 S.Ct. 2427. Again, the Court held that immunity was required so that the SEC "could carry out [its] responsibility free from the disruption of conflicting judgments that might be voiced by courts exercising jurisdiction under the antitrust laws." *NASD,* 422 U.S. at 734–35, 95 S.Ct. 2427.

■ When read together, *Silver, Gordon* and *NASD* yield "two narrowly-defined situations" in which the doctrine of implied immunity will apply: " 'first, when an agency, acting pursuant to a specific Congressional directive, actively regulates the particular conduct challenged [the *Gordon* scenario], ... and second, when the regulatory scheme is so pervasive that Congress must be assumed to have foresworn the paradigm of competition [the *NASD* scenario].' " *Stock Exchanges Options,* 317 F.3d at 147 (quoting *Northeast-*

*ern Tel. Co. v. AT & T,* 651 F.2d 76, 82 (2d Cir.1981)).

■ While the Supreme Court has identified these two situations in which implied repeal will apply, "[i]t is a cardinal principle of construction that repeals by implication are not favored." *United States v. Borden Co.,* 308 U.S. 188, 198, 60 S.Ct. 182, 84 L.Ed. 181 (1939). Therefore, "only where there is a 'plain repugnancy between the antitrust and regulatory provisions' will repeal be implied." *Gordon,* 422 U.S. at 682, 95 S.Ct. 2598 (quotation omitted); *accord Stock Exchanges Options,* 317 F.3d at 148 ("To be sure, antitrust immunity is not to be presumed from the mere existence of overlapping authority; rather the analysis must focus on the 'potential' for *'conflicts* between the antitrust laws and a[n authorized] regulatory scheme.' ") (emphasis and alteration in original) (quoting *Strobl v. New York Mercantile Exch.,* 768 F.2d 22, 27 (2d Cir.1985)). Accordingly, "implied immunity analysis requires a fairly fact-specific inquiry into the nature and extent of regulatory action that allegedly conflicts with antitrust law." *Friedman v. Salomon/Smith Barney, Inc.,* 313 F.3d 796, 799 (2d Cir.2002), *cert. denied,* 71 U.S.L.W. 3791, —— U.S. ——, 124 S.Ct. 152, —— L.Ed.2d —— (2003) (No. 02–1808); *accord Northeastern Tel.,* 651 F.2d at 83 (implied immunity "must be evaluated in terms of the particular regulatory provision involved, its legislative history, and the administrative authority exercised pursuant to it").

Two recent Second Circuit decisions, *Friedman* and *Stock Exchanges Options,* have clarified the implied immunity doctrine in the context of the interrelationship between securities regulation and the antitrust laws.

The Second Circuit in *Friedman* concluded that, while the SEC did not expressly authorize broker-dealer restrictions designed to discourage "flipping" of IPO shares in order to stabilize prices in the aftermarket, implied immunity from antitrust regulation was proper. 313 F.3d at 803. The court reasoned that "allowing an antitrust lawsuit to proceed would conflict with Congress' implicit determination that the SEC should regulate the alleged anti-competitive conduct." *Friedman,* 313 F.3d at 801.

In reaching its determination, the Second Circuit reviewed the "SEC's regulation of price stabilization in both the distribution and aftermarket phases of public offerings." *Friedman,* 313 F.3d at 801. The *Friedman* court noted that the Exchange Act gave the Commission authority to regulate the restrictive practices alleged by the plaintiffs, and that the Commission had repeatedly acknowledged its awareness of such conduct. 313 F.3d at 802. In addition, the Second Circuit noted that the Commission had exercised its authority over the conduct even though it had never prohibited it, because the Exchange Act "allows price stabilization practices that the SEC does not prohibit." *Friedman,* 313 F.3d at 802.

Discussing the conflict requirement inherent in consideration of implied immunity, the *Friedman* court held that:

implied immunity exists where allowing parallel proceedings on antitrust and SEC tracks would subject defendants to conflicting mandates. The source of the conflict may, but need not, involve affirmative SEC action. Conflict also can exist where the SEC has jurisdiction over the challenged activity and deliberately has chosen not to regulate it.

313 F.3d at 801. Thus, the Second Circuit clarified that the "plain repugnancy" required to trigger implied immunity need not be a firefight between the antitrust laws and securities regulation, but rather

"extends to potential as well as actual conflicts." *Friedman,* 313 F.3d at 799.

In the wake of *Friedman,* the Second Circuit in *Stock Exchanges Options* upheld antitrust immunity for the practice of restricting equity options trading to a single exchange. *Stock Exchanges Options,* 317 F.3d at 153. Although the conduct alleged was prohibited by both the antitrust laws and securities laws at the time the case was decided, the Second Circuit held the conduct impliedly immune on the grounds that "the SEC has ample statutory authority, which it has repeatedly exercised, to regulate the listing and trading of equity options," and the specific conduct at issue fell within that broader authority. *Stock Exchanges Options,* 317 F.3d at 150. As a result, "the antitrust laws conflict with an overall regulatory scheme that empowers the agency to allow conduct that the antitrust laws would prohibit." *Stock Exchanges Options,* 317 F.3d at 149.

The *Stock Exchanges Options* court began by examining the history of the SEC's regulation of equity options trading, noting that the SEC has vacillated between allowing and prohibiting multiple option listing numerous times since the trading of options on national exchanges began in 1973. *Stock Exchanges Options,* 317 F.3d at 139–142. The Commission's oscillating approach to multiple option listing assisted the *Stock Exchanges Options* court in characterizing the broad scope of the SEC's authority:

> [T]he SEC has ample authority, which it has repeatedly exercised, to regulate the listing and trading of equity options. It has at times encouraged multiple listing and at times disapproved of that practice.... Although the SEC's present stance is that agreements for exclusive listing are forbidden, the Commission has the power to alter that position if it concludes that other concerns within its

domain outweigh the need to protect competition. We see no way to reconcile that SEC authority, which may be exercised to permit agreements for exclusive listing of equity options, with the antitrust laws.

317 F.3d at 150.

Like the Sherman Act Plaintiffs, the plaintiffs in *Stock Exchanges Options* argued that the conduct at issue should not be immune from antitrust scrutiny because it was expressly prohibited by both SEC regulations and the antitrust laws at the time the action was filed. 317 F.3d at 144. The Second Circuit disagreed, holding that the broad scope of the SEC's authority over the listing and trading of equity options, rather than the fortuity of timing, was the touchstone for implied immunity:

> Although plaintiffs contend that an implied repeal is not needed to avoid conflicts here because exclusivity agreements are now prohibited by both the antitrust laws and the SEC, that contention misperceives the proper analytical focus. The appropriateness of an implied repeal does not turn on whether the antitrust laws conflict with the current view of the regulatory agency; rather it turns on whether the antitrust laws conflict with an overall regulatory scheme that empowers the agency to allow conduct that the antitrust laws would prohibit.

*Stock Exchanges Options,* 317 F.3d at 149. Thus, the Second Circuit in *Stock Exchanges Options* held the antitrust laws impliedly repealed based not on the existence of a current conflict between the particular SEC regulations and antitrust laws, but rather on the *potential* that future SEC regulation could conflict with the antitrust laws and expose defendants to inconsistent mandates. Citing *Gordon* and *NASD,* the *Stock Exchanges Options* court reasoned that:

"[P]ermitting courts throughout the country to conduct their own antitrust proceedings would conflict with *the regulatory scheme authorized by Congress,*" and that the "[i]mplied repeal of the antitrust laws *is,* in fact, necessary to" avoid "render[ing] nugatory *the legislative provision for regulatory agency supervision.*" Thus, the proper focus is not on the Commission's current regulatory position but rather on the Commission's authority to permit conduct that the antitrust laws would prohibit. *Stock Exchanges Options,* 317 F.3d at 149 (emphasis in original) (internal quotations omitted).

*Friedman* and *Stock Exchanges Options* have focused the inquiry concerning implied immunity by counseling that the power to regulate is tantamount to regulation. Thus, the *Gordon* threshold that antitrust laws and securities regulation be "plainly repugnant" is satisfied by potential, as well as actual, conflicts. *See Stock Exchanges Options,* 317 F.3d at 149; *Friedman,* 313 F.3d at 801.

## III. *Amicus Curiae Submissions*

This Court invited, and received, *amicus curiae* briefs from the SEC and the Department of Justice, Antitrust Division (the "DOJ"), addressed to the issue of implied immunity. The SEC argues that implied immunity is required in this case, noting its past and continuing regulation of the IPO process, the syndicate system and various nominally anticompetitive price stabilization techniques. (Memorandum *Amicus Curiae* of the SEC ("SEC *Amicus* Br."), at 39–40.) The DOJ, in contrast, argues that implied immunity is improper in this case, and that antritrust scrutiny of the alleged conduct is necessary. (Memorandum of the United States as *Amicus Curiae* ("DOJ *Amicus* Br.") at 23.) In addition, this Court received an *amicus*

*curiae* submission from the Office of the Attorney General of the State of New York, Antitrust Division (the "NYAG"), which largely echoes the position of the DOJ. (N.Y.AG's letter submission as *amicus curiae* ("NYAG *Amicus* Br."), at 14.)

## IV. *Implied Immunity With Respect To The Sherman Act Plaintiffs*

■ In its *amicus* brief, the SEC asserts that "[t]he IPO allocation and commission practices challenged [by the Sherman Act Plaintiffs] fall within the very heart of the Commission's regulatory authority over underwriting syndicates under both the Securities Act of 1933, 15 U.S.C. § 77a, *et seq.* [the "Securities Act"], and the [Exchange Act], and they are comprehensively regulated." (SEC *Amicus* Br. at 1.) While this Court agrees with the SEC's contention that its regulatory authority over the conduct alleged in the Sherman Act Complaint is pervasive, it need not reach the question of whether there should be implied immunity under the *NASD* scenario. The reason is that the conduct alleged by the Sherman Act Plaintiffs is immune from antitrust scrutiny under a *Gordon* analysis, as informed by *Friedman* and *Stock Exchanges Options.* In the first instance, the SEC explicitly permits much of the conduct alleged in the Sherman Act Complaint. More importantly, the SEC, through application of its broad regulatory authority over the spectrum of conduct related to securities offerings, is empowered to regulate the conduct alleged by the Sherman Act Plaintiffs. It is this sweeping power to regulate that spawns the potential conflict with the antitrust laws that, under *Friedman* and *Stock Exchanges Options,* requires a finding of implied immunity.

### A. *Underwriter Conduct Permitted By The Securities Regulatory Regime*

When the inflammatory characterizations are centrifuged from the Sherman

Act Complaint, much of the conduct alleged is authorized under the current securities regulatory regime. For example, the Sherman Act Plaintiffs assert that the Underwriter Defendants engaged in a number of joint activities, including that: (1) the Underwriter Defendants "still regularly combined with one another during the Class Period into underwriting syndicates" (Sherman Act Compl. ¶ 38); (2) the Underwriter Defendants engaged in a secret "centralizing agreement" that the lead underwriter "could itself distribute all the shares of each Class Security" (Sherman Act Compl. ¶ 39); and (3) syndicate members who did not sell all of their allotment "nevertheless shared in the underwriters' discount" (Sherman Act Compl. ¶ 39). Those allegations, however, are nothing more than a theater-wide attack on the syndicate system, the predominant structure for the public distribution of equities since the infancy of the securities markets. *See United States v. Morgan*, 118 F.Supp. 621, 635 (S.D.N.Y.1953) ("[T]he syndicate system as a means of issuing and distributing security issues was in use at least as early as the 1890's.").[6]

While the SEC's regulation of the syndicate system is generally accomplished through its direct regulation of the NASD and other self-regulatory organizations ("SROs"), the Commission itself expressly recognizes the validity of the syndicate system. *See, e.g.,* Exchange Act Release No. 17371, 21 S.E.C. Dkt. 930 (Dec. 12, 1980) (the "Papilsky Release") (providing an overview of the syndicate system and describing the "broad discretionary authority" typically granted to the managing underwriter by the "agreement among underwriters ... that establishes the obligations of each [syndicate] member"). However, it is the SEC's pervasive regulatory oversight over the NASD, "the only 'national securities association' registered with the SEC pursuant to 15 U.S.C. § 78o–3," *Domestic Sec., Inc. v. SEC*, 333 F.3d 239, 242 (D.C.Cir.2003), and other SROs, that is the cornerstone of the SEC's authority over the syndicate system. *See NASD*, 422 U.S. at 732, 95 S.Ct. 2427 (SEC has "pervasive" authority over the NASD).

As a registered national securities association under the 15 U.S.C. § 78o–3, the NASD comprehensively and actively regulates syndicates—including their formation, communications among syndicate members, commission structure, allocation of securities and fee arrangements—pursuant to rules that are formally reviewed by the SEC and subject to its approval. *See* 15 U.S.C. § 78s(b) (requiring that all rules promulgated by SROs be approved by the SEC, and setting out procedures for review thereof); *accord Domestic Sec.*, 333 F.3d at 241 ("Under the [Exchange Act], the [SEC] must approve any changes to the rules of the [NASD]."). For example, NASD Rule 2110 and interpretation IM–2110–5, which prohibit certain forms of

---

**6.** For a detailed history of the syndicate system in the United States, this Court refers to then-District Judge Harold Medina's learned opinion in *Morgan*, 118 F.Supp. at 635–55. Briefly, a company desiring to sell stock to the public (an "issuer") hires an investment bank (the "managing underwriter") to effect the public distribution of shares at a fixed price agreed upon by the issuer and the managing underwriter (the "offering price"). In almost all instances, the offering price is set below the estimated market value of the stock to ensure its attractiveness to purchasers. The managing underwriter organizes an underwriting syndicate, which is a consortium of investment banks responsible for distributing shares to the public. The syndicate members make a concurrent public offering of the issuer's shares at the offering price, with uniform concessions at each level of the distribution. *See generally* 1 Louis Loss & Joel Seligman, *Securities Regulation* 328–34 (3d ed.2003).

price coordination and intimidation as "inconsistent with just and equitable principles of trade," explicitly disclaim any limitation, constraint or other restriction on the "freedom" of broker-dealers to "engage in any underwriting (or any syndicate for the underwriting) of securities to the extent permitted by the federal securities laws." NASD Manual, IM–2110–5: Anti-Intimidation/Coordination; *see also* NASD Manual, Rule 2110: Standards of Commercial Honor and Principles of Trade.

Further, NASD Rule 2110 and interpretation IM–2110–1 combine to require all participants in an offering syndicate to make *bona fide* public distributions, and prohibit them from either withholding securities for their own benefit or using an allocation of securities to reward persons for future business. NASD Manual, Rule 2110; NASD Manual, IM–2110–1: Free-Riding and Withholding. However, that same combination of NASD Rule 2110 and interpretation IM–2110–1 explicitly permits syndicate participants to engage in communications "for the purpose of exploring the possibility of a purchase or sale of that security, and to negotiate for or agree to such purchase or sale." NASD Manual, IM–2110–1. A number of other NASD rules and interpretations regulate various aspects of the syndicate system, including the actions of its broker-dealer participants.[7]

In addition to a general indictment of the syndicate system, the Sherman Act Plaintiffs brand as conspiratorial joint actions by the Underwriter Defendants during the "road show" process. For example, to support their conspiracy claim, the Sherman Act Plaintiffs allege that defendants: (1) "jointly and individually, hosted 'road shows' during which customers were introduced to the issuer and its managers and during which the offering was described"; (2) "conducted telephone calls, meetings and other regular communications prior to the IPOs of Class Securities;" and (3) "at times jointly, made inquiries of customers or others interested in purchasing Class Securities concerning the number of shares that such person would be willing to purchase in the aftermarket and the prices such person would be willing to pay for such shares." (Sherman Act Compl. ¶ 54.) Each of these actions, however, are expressly permitted during the "road show" period.

While Section 5 of the Securities Act, 15 U.S.C. § 77e, imposes restrictions on nonexempt offerings of securities—including prohibitions on offers before a registration statement is filed, as well as limitations on oral and written communications with potential buyers after the registration statement is filed but before it becomes effective—Section 2(a)(3) excludes from those offering restrictions certain communications, including "preliminary negotiations or agreements between an issuer … and any underwriter or among underwriters who are or are to be in privity of contract with an issuer." 15 U.S.C. § 77b(a)(3). In

---

7. *See, e.g.,* NASD Manual, Rule 2330: Customers' Securities or Funds (prohibiting NASD member firms from profit-sharing in customer accounts); NASD Manual, Rule 2710: Corporate Financing Rule—Underwriting Terms and Arrangements (governing public offering filing requirements, review process, and underwriter compensation); NASD Manual, Rule 2740: Selling Concessions, Discounts and Other Allowances (restrictions on selling concessions, discounts, or other allowances by members in connection with the sale of securities which are part of a fixed price offering); NASD Manual, Rule 2770: Disclosure of Price in Selling Agreements (mandating disclosure of public selling price, and any concessions thereto, in "[s]elling syndicate agreements"); NASD Manual, Rule 4624: Penalty Bids and Syndicate Covering Transactions (requiring written notice of intention to impose penalty bids or conduct syndicate covering transactions by the syndicate manager).

addition, Securities Act Rule 134 permits broker-dealers to collect from potential buyers "indications of interest" in an IPO prior to its issuance. 17 C.F.R. § 230.134(d) (permitting broker-dealers to "solicit from the recipient of the communication an offer to buy the security or request the recipient to indicate ... whether he might be interested in the security").[8]

Apart from their indiscriminate assault on the syndicate system and various "road show" practices, the Sherman Act Plaintiffs also seek to support their claim of an "unlawful agreement" by alleging that the Underwriter Defendants "frequently communicated with one another as members of the [NASD] where they jointly participated in the trading of securities on ... NASDAQ, and are members of various national and regional exchanges, including the [NYSE] ... and the American Stock Exchange ('AMEX')." (Sherman Act Compl. ¶ 47.) However, the Sherman Act Plaintiffs ignore the fact that the SEC not only permits such conduct, it *requires* that broker-dealers be members of, or employ, one of these SROs.[9] In addition, the Sherman Act Plaintiffs allege that the Underwriter Defendants communicated and worked together as market makers (Sherman Act

**8.** *See also* 17 C.F.R. § 242.101(b)(9) (exempting "[o]ffers to sell or the solicitation of offers to buy the securities being distributed (including securities acquired in stabilizing), or securities offered as principal by the person making such offer or solicitation" from restrictions on distribution participants during restricted period); 17 C.F.R. § 242.102(b)(5) (exempting "[o]ffers to sell or the solicitation of offers to buy the securities being distributed" from restrictions on activities by issuers and selling security holders during distribution); Private Financial Network, SEC No-Action Letter, Fed. Sec. L. Rep. (CCH) ¶ 77,-332 (Mar. 12, 1997) (stating that electronic roadshow presentations transmitted over the internet to potential investors do not constitute a "prospectus" under the 15 U.S.C. § 77b(a)(10)); *Institutional Investor Study of the SEC*, H.R. Doc. No. 92–64, Pt. 5, at 2337 (1971) ("The expected level [of price] is influenced by the indications of interest [the underwriters] receive in response to their dissemination of the preliminary prospectuses and oral inquiries."); Offers and Sales of Securities by Underwriters and Dealers, Securities Act Release No. 4697, 1964 WL 68261, at *2 (May 28, 1964) (during the period after the filing and before the effective date of the registration statement, a broker-dealer "can orally solicit indications of interest or offers to buy and may discuss the securities with his customers and advise them whether or not in his opinion the securities are desirable or suitable for them"); Publication of Information Prior to or After the Effective Date of a Registration Statement, Securities Act Release No. 3844, 1957 WL 3605, at *2 (Oct. 8, 1957) (publication of information prior to or after effective date of registration statement, including restrictions on communications during waiting period); *cf.* 17 C.F.R. §§ 230.137 to 139 (permitting certain communications through issuance of research reports); 17 C.F.R. § 230.460 (in context of requests for acceleration of the effective date of a registration statement, recognizing the role of underwriters in disseminating information about the offering and the issuer).

**9.** *See* 15 U.S.C. § 78*o*(b)(8) ("It shall be unlawful for any registered broker or dealer to effect any transaction in ... any security ... unless such broker or dealer is a member of a securities association registered pursuant to section 78*o*–3 of this title or effects transactions in securities solely on a national securities exchange of which it is a member."); *see also* 15 U.S.C. § 78c(a)(26) ("The term 'self-regulatory organization' means any national securities exchange, registered securities association, or registered clearing agency."); 15 U.S.C. § 78f (governing registration and operation of national securities exchanges); *cf. Barbara v. New York Stock Exch.*, 99 F.3d 49, 51 (2d Cir.1996) ("The [NYSE] is a nonprofit New York corporation registered with the [SEC] as a national securities exchange pursuant to ... 15 U.S.C. § 78f ... [and] a 'self-regulatory organization' [under] 15 U.S.C. § 78c(a)(26)."); *Feins v. American Stock Exch., Inc.*, 81 F.3d 1215, 1218 (2d Cir.1996) ("AMEX is registered as a national securities exchange pursuant to ... 15 U.S.C. § 78f, and is a 'self-regulatory organization' as defined by ... 15 U.S.C. § 78c(a)(26).").

Compl. ¶ 45), conduct that is also expressly permitted under the current securities regulatory regime.[10]

As each of the aforementioned activities alleged in the Sherman Act Complaint are expressly permitted under the current securities regulatory regime,[11] a determination by a court that any of them constituted an antitrust violation would bring the antitrust laws into direct conflict with the securities laws. This species of "plain repugnancy between the antitrust and regulatory provisions" would, in the absence of a finding of implied immunity, "render nugatory the legislative provision for regulatory agency supervision." *Gordon*, 422 U.S. at 682, 691, 95 S.Ct. 2598.

### B. The SEC's Power To Regulate The Conduct Alleged In The Sherman Act Complaint

Although much of the conduct alleged in the Sherman Act Complaint is expressly permitted under the current securities regulatory regime, *see supra* Section IV.A, certain alleged conduct could be deemed prohibited under both the securities laws and the antitrust laws. For example, the Sherman Act Plaintiffs allege impermissible "tie-in" and "laddering" arrangements (Sherman Act Compl. ¶¶ 4(b), 7), as well as

"commissions on the purchase and sale of other securities, purchases of an issuer's shares in the follow-up or 'secondary' public offerings (for which the underwriters would earn underwriting discounts), [and] commitments to purchase other, less attractive securities, or the laddered purchases." (Sherman Act Compl. ¶ 6.) While this conduct, under certain circumstances, could be deemed violative of the securities laws, such a finding would not be fatal to a conferral of implied immunity. This is because the SEC has broad power to regulate the conduct at issue in this case, and therefore potential conflicts exist even between activities that are, at the current time, prohibited under both the securities and antitrust regulatory regimes. Under the Supreme Court trilogy of *Silver, Gordon* and *NASD*, as interpreted by the Second Circuit in *Friedman* and *Stock Exchanges Options*, such potential conflicts require a finding of implied immunity. *See Stock Exchanges Options*, 317 F.3d at 149 ("[T]he proper focus is not on the Commission's current regulatory position but rather on the Commission's authority to permit conduct that the antitrust laws would prohibit."); *Friedman*, 313 F.3d at 799 ("[T]he 'plain repugnancy', or conflict, between antitrust and securities laws ex-

---

**10.** *See* NASD Manual, Rules 4600 to 4652: NASDAQ Market Maker Requirements, esp. Rule 4611: Registration As A Nasdaq Market Maker (noting that "[q]uotations and quotation sizes may be entered into The Nasdaq Stock Market *only* by an Association member registered as a Nasdaq market maker") (emphasis added); 17 C.F.R. § 242.103 ("This section permits broker-dealers to engage in market making transactions in covered securities that are Nasdaq securities without violating the provisions of § 242.101.").

**11.** Other actions alleged in the Sherman Act Complaint, while not expressly permitted, are not prohibited by any SEC or SRO regulation. These include allegations that the Underwriter Defendants: (1) collaborated with one another in trade associations such as the Securi-

ties Industry Association (Sherman Act Compl. ¶ 46); (2) held meetings among top investment bankers, legal officers, and marketing managers (Sherman Act Compl. ¶ 48); (3) disclosed to each other the identities of the customers to whom they allocated, or intended to allocate, offered securities (Sherman Act Compl. ¶ 56); and (4) maintained systems that promptly informed defendants of commissions, charges, and other payments that their customers were making and the customers' commissions-to-equity ratios and turnover ratios (Sherman Act Compl. ¶ 62). In its *amicus* submission, the SEC represents that "none" of the aforementioned activities "are improper under the governing regulations." (SEC *Amicus* Br. at 35–36.)

tends to potential as well as actual conflicts.").

The broad general authority to regulate IPO allocation and underwriter commission practices is granted to the SEC by: (1) the Securities Act, under which the Commission regulates the offering process; (2) the Exchange Act, under which the Commission defines and regulates manipulative acts in connection with the purchase or sale of securities; and (3) its reservoir of rulemaking authority over SROs. Indeed, according to the SEC, these practices "fall within the very heart of the Commission's regulatory authority over underwriting syndicates." (SEC *Amicus* Br. at 1.)

1. *The Broad Scope Of The SEC's Authority Sets The SEC Apart From Other Federal Regulatory Agencies*

The SEC's power to regulate all aspects of the national securities markets is integral to the system of capital formation in the United States. The architecture of the securities regulatory regime, and Congress' sweeping grant of rulemaking and enforcement authority to the SEC, differentiates the Commission from other federal regulatory agencies.[12] Therefore, the Sherman Act Plaintiffs' reliance on *Strobl v. New York Mercantile Exch.*, 768 F.2d 22 (2d Cir.1985), and similar cases is misplaced.

In *Strobl,* the Second Circuit found that implied immunity was not warranted where the alleged manipulative conduct violated both the Commodities Exchange Act (the "CEA") and the Sherman Act. 768

F.2d at 31. *Strobl,* however, presents a very different case than the current action in that "price manipulation is an evil that is always forbidden under every circumstance by both the [CEA] and the antitrust laws ... [and][t]herefore, application of the latter cannot be said to be repugnant to the purposes of the former." 768 F.2d at 28. As such, no potential conflict could arise between the antitrust laws and the CEA since both have competition as their sole statutory goal.

In contrast, the securities laws take into consideration more than just free competition, and in fact permit price manipulation in certain instances despite its effect on competition. *See* S.Rep. No. 94–75, at 13 (1975), *reprinted in* 1975 U.S.C.C.A.N. 179, 191 (noting that Commission's "explicit obligation to balance ... the competitive implications of self-regulatory and Commission action *should not be viewed as requiring the Commission to justify that such actions be the least anti-competitive manner of achieving a regulatory objective.* Rather, the Commission's obligation is to weigh competitive impact in reaching regulatory conclusions.") (emphasis added); *Finnegan,* 915 F.2d at 825–26 ("It is recognized that competition is the touchstone of the antitrust laws, while in the regulated securities industry the emphasis is on requiring full disclosure without otherwise changing the balance in the market for corporate control. Tension and at times conflict exist between these established public policies."); *see also* 15 U.S.C. § 78o–3(b)(9) (national securities association may not impose "any burden on com-

---

**12.** *See, e.g.,* H.R.Rep. No. 73–1383, at 6–7 (1934) ("In a field where practices vary and where practices legitimate for some purposes may be turned to illegitimate and fraudulent means, broad discretionary powers in the [SEC] have been found practically essential."); S.Rep. No. 73–792, at 5 (1934) ("From the outset, the Committee has proceeded on the theory that so delicate a mechanism as the modern stock market cannot be regulated efficiently under a rigid statutory program. Unless considerable latitude is allowed for the exercise of administrative discretion, it is impossible to avoid, on the one hand, unworkable 'strait-jacket' regulation and, on the other, loopholes which may be penetrated by slight variations in the method of doing business.").

petition not necessary or appropriate in furtherance of the purposes" of the Act). The breadth of the SEC's authority, in conjunction with its unique mandate to balance competition with other market concerns, increases the likelihood of conflict with antitrust laws, and thus weighs heavily in favor of granting implied immunity where the securities regulatory regime, rather than a relatively narrow statute such as the CEA, is implicated.[13]

## 2. *The SEC's Power To Regulate Under The Securities Act*

The Securities Act provides the SEC with plenary authority to regulate the initial public offering of securities. First, the SEC has power to regulate all aspects of the syndicate system. *See supra* Section IV.A. This includes the power to require the registration of securities, determine the effectiveness of such registration statements, and punish violations.[14] Further, the Securities Act gives the Commission the power to regulate communications among underwriting participants and their customers prior to distribution, including roadshows, the dissemination of prospectuses, the process of book-building and solicitations of "indications of interest." [15] Finally, Section 28 of the Securities Act permits the SEC "to exempt [by rule or

**13.** The same analysis undermines the Sherman Act Plaintiffs' reliance on *Law Offices of Curtis V. Trinko, LLP v. Bell Atlantic Corp.*, 305 F.3d 89, 109 (2d Cir.2002) (rejecting implied immunity under the 1996 Telecommunications Act where the Act was intended to "throw[] all aspects of the industry open to competition and thus antitrust analysis" and contained a "specific savings clause, which specifies that 'nothing in this Act or the amendments made by this Act ... shall be construed to modify, impair, or supersede the applicability of any of the antitrust laws.'") (internal quotations omitted), *cert. granted in part,* —— U.S. ——, 123 S.Ct. 1480, 155 L.Ed.2d 224 (2003) (No. 02–682).

**14.** *See* 15 U.S.C. § 77e (prohibitions relating to interstate commerce and the mails); 15 U.S.C. § 77f (registration of securities); 15 U.S.C. § 77g (information required in registration statement); 15 U.S.C. § 77h (taking effect of registration statements and amendments thereto); 15 U.S.C. § 77k (civil liabilities on account of false registration statement); 15 U.S.C. § 77aa (schedule of information to be included in a registration statement, including "(16) the price at which it is proposed that the security shall be offered to the public ... and any variation therefrom ... [and] (17) all commissions or discounts paid or to be paid, directly or indirectly, by the issuer to the underwriters in respect of the sale of the security to be offered.").

**15.** *See supra* Section IV.A; *see also* 15 U.S.C. § 77b(a)(3) (excluding from offering restrictions communications including "preliminary negotiations or agreements between an issuer ... and any underwriter or among underwriters who are or are to be in privity of contract with an issuer"); 15 U.S.C. § 77j (information required in a prospectus); 15 U.S.C. § 77l (civil liabilities arising in connection with prospectuses and communications); 15 U.S.C. § 77z–2 (application of safe harbor for forward-looking statements); 17 C.F.R. § 230.134(d) (permitting broker-dealers to "solicit from the recipient of the communication an offer to buy the security or request the recipient to indicate ... whether he might be interested in the security"); Offers and Sales of Securities by Underwriters and Dealers, Securities Act Release No. 4697, 1964 WL 68261, at *2 (May 28, 1964) (during the period after the filing and before the effective date of the registration statement, a broker-dealer "can orally solicit indications of interest or offers to buy and may discuss the securities with his customers and advise them whether or not in his opinion the securities are desirable or suitable for them"); Publication of Information Prior to or After the Effective Date of a Registration Statement, Securities Act Release No. 3844, 1957 WL 3605, at *2 (Oct. 8, 1957) (publication of information prior to or after effective date of registration statement, including restrictions on communications during waiting period); *see also* 17 C.F.R. § 230.144 (Securities Act Rule 144 governing persons deemed not to be engaged in a distribution and therefore not underwriters); 17 C.F.R. § 230.144A (Securities Act

regulation] any person, security, or transaction, or any class or classes of persons, securities or transactions, from any provision or provisions of [the Securities Act.]." 15 U.S.C. § 77z–3; *see also* 15 U.S.C. § 77r (conferring authority on the Commission to "make, amend, and rescind such rules and regulations as may be necessary to carry out the provisions" of the Securities Act).

### 3. *The SEC's Power To Regulate Under The Exchange Act*

The Exchange Act grants the Commission sweeping authority to define and prohibit manipulative practices in connection with securities offerings.[16] *See Friedman,* 313 F.3d at 802 (the Exchange Act "allows price stabilization practices that the SEC does not prohibit"). For example, Section 9(a) of the Exchange Act outlaws certain forms of manipulative conduct involving exchange-listed securities in the aftermarket, and empowers the Commission to determine whether potentially abusive practices involving those securities should be prohibited, permitted or regulated, including whether certain acts of aftermarket stabilization are permissible:

> It shall be unlawful for any person, directly or indirectly ... (6) To effect ... any series of transactions ... for the purpose of pegging, fixing or stabilizing the price of such security *in contraven-*

Rule 144A governing private resales of securities to institutions); 17 C.F.R. § 230.176 (Securities Act Rule 176 governing circumstances affecting the determination of what constitutes reasonable investigation and reasonable grounds for belief under § 11 of the Securities Act); 17 C.F.R. § 230.415 (Securities Act Rule 415 governing delayed or continuous offering and sale of securities); 17 C.F.R. § 230.430A (Securities Act Rule 430A governing the prospectus in a registration statement at the time of effectiveness).

**16.** *See, e.g.,* Anti–Manipulation Rules Concerning Securities Offerings, Exchange Act

*tion of such rules and regulations as the Commission may prescribe as necessary and appropriate in the public interest or for the protection of investors.*

15 U.S.C. § 78i(a) (emphasis added); *see also* 17 C.F.R. § 242.104 (establishing guidelines for stabilization). Whether actions such as the "laddering" or "tie-in" arrangements alleged by the Sherman Act Plaintiffs are permissible aftermarket stabilization practices is not for this Court to determine. It is enough that the Commission is granted the authority to make that determination. *See Stock Exchanges Options,* 317 F.3d at 149 ("The appropriateness of an implied repeal ... turns on whether the antitrust laws conflict with an overall regulatory scheme that empowers the agency to allow conduct that the antitrust laws would prohibit.").

Similarly, Section 10(b) of the Exchange Act gives the Commission broad rulemaking authority to address "manipulative and deceptive devices," making it unlawful for any person to employ "any manipulative or deceptive device or contrivance *in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.*" 15 U.S.C. § 78j(b) (emphasis added). Section 15(c), dealing with the registration and regulation of broker-dealers like the Un-

Release No. 7375, 62 Fed.Reg. 520 (Jan. 3, 1997) ("Congress granted the Commission broad rulemaking authority to combat manipulative abuses in whatever form they might take."); Review of Antimanipulation Reg. Of Sec. Offerings, 56 S.E.C. Dkt. 1302 (Apr. 19, 1994) ("Because Congress recognized that market manipulations can assume many forms, it did not define the term in the Exchange Act or elsewhere," but instead provided to the Commission "authority to define manipulative practices and adopt rules to proscribe and prevent such conduct.").

derwriter Defendants, prohibits broker-dealers from engaging in any transaction "in connection with which such broker or dealer engages in any fraudulent, deceptive, or manipulative act or practice," 15 U.S.C. § 78o(c)(2)(A), and gives the Commission the power "by rules and regulations [to] define, and prescribe means reasonably designed to prevent, such acts and practices as are fraudulent, deceptive, or manipulative." 15 U.S.C. § 78o(c)(2)(D). The Commission's authority extends to manipulative or deceptive conduct undertaken either unilaterally or in conjunction with other broker-dealers,[17] and it has implemented this arsenal of authority through the adoption of multifarious rules both defining and addressing manipulative and deceptive conduct.[18]

By far the clearest manifestation of the Commission's power to regulate the landscape of allegedly manipulative and deceptive conduct at issue in this case can be found in 17 C.F.R. § 242.100–05, known as "Regulation M." Regulation M was adopted in 1996 to replace Exchange Act Rules 10b–6, 6A, 7, 8 and 21 (the "trading practice rules"). *See* SEC Release No. 33–7375, 62 Fed.Reg. 520 (Jan. 3, 1997). Regulation M, like the trading practice rules that preceded it, is "intended to prevent those having a financial interest in a distribution from either manipulating the price of a security or boosting its trading volume and thereby misleading potential investors as to the 'true' state of the public market for the security being distributed."[19] (SEC *Amicus* Br. at 11.)

Specifically, Regulation M prohibits distribution participants—including issuers, selling security holders and underwriters—from bidding for or purchasing, or attempting to induce others to bid for or purchase, the securities being distributed during the restricted period. 17 C.F.R. § 242.101. Importantly, Regulation M exempts certain conduct that would otherwise be prohibited, such as "[t]ransactions among distribution participants in connec-

---

**17.** *See, e.g.*, 15 U.S.C. § 78i(a)(6) ("To effect either alone or with one or more other persons any series of transactions...."); 17 C.F.R. § 242.101 (prohibiting manipulative activity undertaken by a distribution participant either alone or with one or more purchasers).

**18.** *See, e.g.*, 17 C.F.R. § 240.10b–3 (prohibiting broker-dealers from employing "in connection with the purchase or sale of any security ... any act, practice, or course of business defined by the Commission to be included within the term 'manipulative, deceptive, or other fraudulent device or contrivance' "); 17 C.F.R. § 240.10b–5 (prohibiting any person from employing manipulative and deceptive devices "in connection with the purchase or sale of any security"); 17 C.F.R. § 240.10b–18 (providing issuers with a safe harbor from liability for manipulation if they repurchase their common stock in the open market in accordance with the rule's manner, time, price, and volume conditions); 17 C.F.R. § 240.15c1–3 (defining broker-dealer misrepresentations concerning registration of securities as "manipulative and deceptive"); 17 C.F.R. § 240.15c1–5 (defining acts by any broker-dealer "controlled by, controlling, or under common control with, the issuer of any security" as "manipulative and deceptive" absent proper disclosure); 17 C.F.R. § 240.15c1–6 (defining participation by broker-dealer's customers in any distribution in which broker-dealer is participating as manipulative or deceptive absent proper disclosure).

**19.** *See also* SEC Release No. 33–7375, 62 Fed.Reg. 520 (Jan. 3, 1997) ("Regulation M is intended to preclude manipulative conduct by persons with an interest in the outcome of an offering."); SEC Division of Market Regulation, Staff Legal Bulletin No. 10: Prohibited Solicitations and "Tie-in" Agreements for Aftermarket Purchases, ¶ 2 (August 25, 2000) ("Bulletin No. 10"), *available at* http://www.sec.gov/interps/legal/slbmr10.htm ("Regulation M is intended to protect the integrity of the offering process by precluding activities that could artificially influence the market for the offered security.").

tion with a distribution, . . . purchases of securities from an issuer or selling security holder in connection with a distribution" and "[o]ffers to sell or the solicitation of offers to buy the securities being distributed." 17 C.F.R. §§ 242.101(b)(8)-(9). In addition, Regulation M governs aftermarket stabilization, prohibiting it except "for the purpose of preventing or retarding a decline in the market price of a security," as well as syndicate covering transactions, the imposition of penalty bids and other related activities.[20] 17 C.F.R. § 242.104; *see also* Papilsky Release, 1980 WL 22136, at *4 ("In connection with some fixed price offerings, the underwriters may elect to 'stabilize' the market for the offered security during the distribution. . . . Stabilization is intended to facilitate an orderly distribution of securities by preventing or retarding a marked decline in the price of the offered security."); *cf.* 17 C.F.R. § 240.17a–2 (Exchange Act rule setting forth certain record-keeping requirements related to stabilization, syndicate covering transactions and penalty bids).

Included in the Commission's interpretation of prohibited activity under Regulation M are the very tie-in, laddering and other aftermarket agreements alleged by the Sherman Act Plaintiffs. On August 25, 2000, the SEC's Division of Market Regulation released Bulletin No. 10, titled "Prohibited Solicitations and 'Tie-in' Agreements for Aftermarket Purchases," in order to "remind[ ] underwriters, broker-dealers, and any other person who is participating in a distribution of securities . . . that they are prohibited from soliciting

or requiring their customers to make aftermarket purchases until the distribution is completed." Bulletin No. 10, Summary. Specifically, Bulletin No. 10 addresses "complaints that, while participating in a distribution of securities, underwriters and broker-dealers have solicited their customers to make additional purchases of the offered security after trading in the security begins," and that "some underwriters have required their customers to agree to buy additional shares in the aftermarket as a condition to being allocated shares in the distribution (i.e., 'tie-in' agreements)." Bulletin No. 10 ¶ 1. Reiterating the Commission's consistent view of this conduct, Bulletin No. 10 explained:

> Tie-in agreements are a particularly egregious form of solicited transaction prohibited by Regulation M. As far back as 1961, the Commission addressed reports that certain dealers participating in distributions of new issues had been making allotments to their customers only if such customers agreed to make some comparable purchase in the open market after the issue was initially sold. The Commission said that such agreements may violate the anti-manipulative provisions of the Exchange Act, particularly Rule 10b–6 (which was replaced by Rules 101 and 102 of Regulation M) under the Exchange Act, and may violate other provisions of the federal securities laws.

Bulletin No. 10 ¶ 2 (footnotes omitted).

Finally, in an analogue to its broad exemptive powers under the Securities Act, Section 36 of the Exchange Act grants the

---

**20.** A syndicate covering transaction is "the placing of any bid or the effecting of any purchase on behalf of the sole distributor or the underwriting syndicate or group to reduce a short position created in connection with the offering." 17 C.F.R. § 242.100(b). A penalty bid is "an arrangement that permits the managing underwriter to reclaim a selling concession from a syndicate member in connection with an offering when the securities originally sold by the syndicate member are purchased in syndicate covering transactions." 17 C.F.R. § 242.100(b). Both are techniques used to stabilize IPO prices in the aftermarket.

SEC general exemptive power pursuant to which "the Commission, by rule, regulation, or order, may conditionally or unconditionally exempt any person, security or transaction, or any class or classes of persons, securities, or transactions, from any provision or provisions of [the Exchange Act] or of any rule or regulation thereunder." 15 U.S.C. § 78mm.

### 4. *The SEC's Pervasive Authority Over SROs*

As noted earlier, the SEC is empowered to regulate or oversee the regulation of the spectrum of broker-dealer conduct through its pervasive regulation of the NASD and other SROs. *See supra* Section IV.A; *see also* NASD Manual, Rule 2210: Communications With The Public (setting out standards and filing requirements for members' communications with the public); NASD Manual, Rule 2711: Research Analysts and Research Reports (rule governing research analyst reports); NASD Manual, Rule 2720: Distribution of Securities of Members and Affiliates—Conflicts of Interest (prohibiting members and associated persons from participating in the distribution of a public offering if there is a conflict of interest with the issuer); NASD Manual, Rule 2750: Transactions With Related Persons (prohibiting the selling or placement of securities by an NASD member engaged in a fixed price offering to certain related persons unless certain conditions are met).

### 5. *The SEC's Power To Regulate Underwriter Compensation And Commission Practices*

Finally, the Commission, along with the NASD and other SROs, engages in active regulation of underwriter compensation and commission practices. *Gordon,* 422 U.S. at 659, 95 S.Ct. 2598 (holding that systems of fixed commission rates, which are under the active supervision of the SEC, are immune from antitrust laws). Apart from its authority over SROs, the Commission itself directly regulates underwriter commissions and compensation. For example, Section 6(e)(1) of the Exchange Act authorizes the Commission to permit a "national securities exchange to impose a reasonable schedule or fix reasonable rates of commissions, allowances, discounts or other fees to be charged by its members for effecting transactions on such exchange." 15 U.S.C. § 78f.[21] In addition, Exchange Act Rule 10b–10 requires broker-dealers to disclose, *inter alia,* brokerage commissions in written trade confirmations required to be sent to customers. 17 C.F.R. § 240.10b–10(a)(2)(i)(B).[22] Further, in order to accelerate the effective date of a registration statement, a registrant must notify the Commission whether the NASD has reviewed the proposed underwriting compensation and "issued a statement expressing no objections to the compensation and other arrangements," and the Commission may deny acceleration if the NASD has

---

**21.** *See also* 15 U.S.C. § 78*o*–3(b) ("An association of brokers and dealers shall not be registered as a national securities association unless the Commission determines that ... (6)[t]he rules of the association ... are not designed to permit unfair discrimination between customers, issuers, brokers, or dealers, to fix minimum profits, to impose any schedule or fix rates of commissions, allowances, discounts, or other fees to be charged by its members.").

**22.** *See also* 15 U.S.C. § 78bb(e) (rejecting liability for broker-dealer "solely by reason of his having caused the account to pay a member of an exchange, broker, or dealer an amount of commission for effecting a securities transaction in excess of the amount of commission another member of an exchange, broker, or dealer would have charged for effecting that transaction").

not issued such a statement. 17 C.F.R. §§ 230.461(a) & (b)(6). Finally, Regulation S–K, Section 508(3) requires that a registration statement "sets out the nature of the compensation and the amount of discounts and commissions to be paid to the underwriter." 17 C.F.R. § 229.508(e).[23]

For its part, the NASD extensively regulates underwriter compensation and commission practices. For example, the NASD's corporate financing rule: (1) defines what constitutes underwriter compensation; (2) sets limits on the amount of compensation that underwriters may receive from issuers and their affiliates; and (3) requires submission of proposed underwriting terms and arrangements for every interstate public offering to the NASD for review and approval prior to distribution. NASD Manual, Rule 2710: Corporate Financing Rule—Underwriting Terms and Arrangements. In addition, NASD Rule 2440, and its accompanying interpretation IM–2440, directly address the fairness and disclosure of commissions charged to a broker-dealer's customers, and provide a non-exclusive list of "relevant factors" that must be considered.

In arguing against the application of implied immunity in this case, the Sherman Act Plaintiffs rely on *In re Public Offering Fee Antitrust Litig.*, No. 98 Civ. 7890(LMM), 00 Civ. 7804(LMM), 2003 WL 21496795, at *1 (S.D.N.Y.June 27, 2003) (*"Public Offering Fee"*), a case dealing with underwriter compensation. In *Public*

*Offering Fee*, District Judge Lawrence M. McKenna declined to confer implied immunity where the plaintiffs alleged that certain underwriters, including some of the Underwriter Defendants in this action, colluded to fix the underwriting fees charged to issuers at seven percent of the proceeds of IPOs valued between $20 million and $80 million. 2003 WL 21496795, at *1. The court rejected the defendants' contention that "implied repeal is appropriate ... because plaintiffs' claims and any adjudication of these claims ... would conflict with the 'long-standing, active and pervasive regulation' by the SEC and the NASD of underwriting compensation in public offerings." *Public Offering Fee*, 2003 WL 21496795, at *2. *Public Offering Fee*, however, is distinguishable from this case.

First, the *Public Offering Fee* plaintiffs alleged that the underwriters colluded to fix commissions at a certain percentage, and the court concluded that the defendants "ha[d] not provided any statutory or regulatory authority, legislative history or past regulatory activity that even hint that the SEC or the NASD permit, have permitted or have the authority to permit the fixing of underwriters' IPO fees." 2003 WL 21496795, at *2. Thus, the allegations in *Public Offering Fee* were of a prototypal horizontal price-fixing conspiracy, a narrow issue that is the very evil the Sherman Act was enacted to combat.[24] In contrast, much of the broad-based conduct alleged by the Sherman Act Plaintiffs in this action is permitted under the current securi-

**23.** Further, the Commission's Division of Enforcement regularly enforces violations of NASD rules concerning underwriter compensation and commissions. *See, e.g., In re A.S. Goldmen & Co., Inc.,* Exchange Act Release No. 44328, 75 S.E.C. Dkt. 53 (May 21, 2001); *In re Shamrock Partners, Ltd.,* Exchange Act Release No. 40663, 68 S.E.C. Dkt. 1382 (Nov. 12, 1998); *In re William Jackson Blaylock,* Exchange Act Release No. 35002, 58 S.E.C. Dkt. 147 (Nov. 23, 1994), *pet. denied,* 96 F.3d 1457, 1996 WL 501667 (11th Cir.1996) (table).

**24.** *See, e.g., Nat'l Collegiate Athletic Ass'n v. Bd. of Regents,* 468 U.S. 85, 107–08, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984) ("Restrictions on price and output are the paradigmatic examples of restraints of trade that the Sherman Act was intended to prohibit.") (citing *Standard Oil Co. v. United States,* 221 U.S. 1, 52–60, 31 S.Ct. 502, 55 L.Ed. 619 (1911)).

ties regulatory regime, *see supra* Section IV.A, while the balance of the allegations are within the scope of the SEC's expansive authority, *see supra* Sections IV.B.1–4, and outside the heartland of Sherman Act prohibitions.

Further, as discussed above, multiple NASD rules define and limit underwriter compensation, and provide a method to determine whether any such compensation is "fair." *See* NASD Manual, Rule 2710: Corporate Financing Rule—Underwriting Terms and Arrangements; NASD Manual, Rule 2440: Fair Prices and Commissions; IM–2440: Mark–Up Policy; *cf. Friedman*, 313 F.3d at 799 ("[I]mplied immunity analysis requires a fairly fact-specific inquiry into the nature and extent of regulatory action that allegedly conflicts with antitrust law."). In addition, under the broad exemptive provisions of the Exchange Act, the SEC has the power to permit a national securities association or exchange to fix any commission or fee structure it sees fit, or to permit certain types of discrimination in the imposition of commissions or fees.[25] Consequently, the SEC, and, by extension, the NASD, may permit the conduct related to commission practices alleged in this case. Accordingly, a nascent conflict between the securities regulatory regime and antitrust laws emerges. *See Stock Exchanges Options*, 317 F.3d at 149; *Friedman*, 313 F.3d at 801.

Finally, the Sherman Act Plaintiffs' allegations concerning unfair commission practices are properly characterized as manipulative. As a result, implied immunity is warranted because of the Commission's pervasive authority to regulate, and active regulation of, manipulative and deceptive practices under the Exchange Act and related rules. *See supra* Section IV. B.3; *see also In re Initial Pub. Offering Sec. Litig.*, 241 F.Supp.2d 281, 383 (S.D.N.Y.2003) (finding a properly-pled 10b–5(b) claim based, *inter alia*, on a failure to disclose "compensation—in the form of money or commissions" under NASD Rule 2710). The Sherman Act Plaintiffs concede this point. (Pl. Opp. at 26 ("The unambiguous language of the statute and regulations makes clear that Defendants-conspirators allegedly engaged in conduct which violated securities laws on disclosure of underwriter compensation.").) Therefore, *Public Offering Fee* does not rescue the Sherman Act Plaintiffs' claims.

### C. The SEC's Consideration Of The Conduct At Issue

In *Friedman*, the Second Circuit pointed to the fact that the SEC had repeatedly acknowledged its awareness of the conduct alleged by the plaintiffs, and exercised its regulatory authority over such conduct even though it had never elected to prohibit it, as well as the fact that the Exchange Act "allows price stabilization practices that the SEC does not prohibit," in reaching its determination that implied immunity was required. *Friedman*, 313 F.3d at 802. Similarly, the Second Circuit in *Stock*

---

**25.** *Compare* 15 U.S.C. § 78f (SEC may permit a "national securities exchange to impose a reasonable schedule or fix reasonable rates of commissions, allowances, discounts or other fees to be charged by its members for effecting transactions on such exchange") *and* 15 U.S.C. § 78*o*–3(b) (a national securities association may not be registered with the SEC absent a determination by the SEC that its rules "are not designed to permit unfair discrimination between customers, issuers, bro-kers, or dealers, to fix minimum profits, to impose any schedule or fix rates of commissions, allowances, discounts, or other fees to be charged by its members") *with* 15 U.S.C. § 78mm ("[T]he Commission ... may conditionally or unconditionally exempt any person, security or transaction, or any class or classes of persons, securities, or transactions, from any provision or provisions of [the Exchange Act] or of any rule or regulation thereunder.").

*Exchanges Options* noted that the SEC had vacillated between allowing and prohibiting multiple options listing on a number of occasions. *See Stock Exchanges Options,* 317 F.3d at 139–142. Plaintiffs, as well as the DOJ and the NYAG, attempt to distinguish this action from *Friedman* and *Stock Exchanges Options* on these facts, arguing that no such active regulation, or affirmative decision not to regulate, exists with respect to the panoply of conduct alleged in the Sherman Act Complaint. That argument, however, overlooks the Commission's well-documented history of considering the very conduct alleged in this action, and its current activity aimed at formulating responses to the alleged "hot issue" abuses of the late 1990s.

### 1. The SEC's Prior Consideration Of The Conduct Alleged In The Sherman Act Complaint

In 1974, the Commission proposed, but did not adopt, Proposed Rule 10b–20.[26] *See* Bulletin No. 10 ¶ 2 n. 6. The proposed rule would have prohibited broker-dealers, issuers and other distribution participants from: (1) requiring a prospective or actual purchaser of an offering to purchase any other security being offered or sold by any of the entities; (2) in the case of a registered distribution of securities, requiring a prospective or actual purchaser of an offering to pay any consideration other than that indicated in the applicable prospectus; and (3) requiring any other act, conduct, transaction or promise of any purchaser of any security offered for sale by such enti-

ties, with certain limited exceptions. Exchange Act Release No. 10636, 39 Fed. Reg. at 7806–07. As the Commission explained in Bulletin No. 10:

> Among other things, [Proposed Rule 10b–20] would have explicitly prohibited broker-dealers (and others) from (explicitly or implicitly) demanding from their customers any payment or consideration (including a requirement to purchase other securities) in addition to the announced offering price of the offered security. This would include, for example, conditioning an allocation of shares in a "hot issue" (for which demand exceeds supply) on an agreement to buy shares in another offering or in the aftermarket of another offering, for which there may be a lack of demand.

Bulletin No. 10 ¶ 2 n. 6.

Proposed Rule 10b–20 was subject to comment for fourteen years. Bulletin No. 10 ¶ 2 n. 6. In 1988, it was withdrawn because, *inter alia,* the SEC "concluded that such agreements [as would have been prohibited under the proposed rule] may be reached under the existing anti-fraud and anti-manipulation provisions of the federal securities laws." Bulletin No. 10 ¶ 2 n. 6. In withdrawing proposed Rule 10b–20, the Commission noted that:

> The proposed rule would prohibit broker-dealers and others from explicitly or implicitly demanding from their customers any payment or consideration in addition to the announced offering price of any securities. The proposal was intended to prohibit the practice whereby

---

**26.** Among other things, Rule 10b–20 would have regulated how underwriters allocate securities of new issues, and banned "tie-in agreements" in connection with such offerings. *See* Notice of Proposed Rules 10b–20 and 10b–21 and Amendments to Rule 17a–3(a)(6) and 17a–3(a)(7) under the Securities Exchange Act of 1934, Exchange Act Release No. 10636, 39 Fed.Reg. 7806 (Feb. 11, 1974);

Exchange Act Release No. 11328, 40 Fed.Reg. 16090 (April 2, 1975). In its proposing release, the Commission noted that one of the rationales for proposed Rule 10b–20 was that some broker-dealers were "imposing requirements involving consideration in addition to the announced price of the shares." 39 Fed. Reg. at 7806.

underwriters induced persons to purchase 'sticky' issues with the opportunity to purchase more attractive 'hot' issues. . . . In view of the substantial period of time that has elapsed since Rule 10b–20 was proposed and the fact that 'tie-in' arrangements may be reached under existing antifraud and anti-manipulation provisions of the federal securities laws, the Commission has determined to withdraw proposed Rule 10b–20.

Withdrawal of Proposed Rules Under the Securities Exchange Act of 1934, Exchange Act Release No. 26182, 53 Fed. Reg. 41,206 (Oct. 20, 1988). Thus, for fourteen years the SEC considered, but eventually rejected, imposing bright-line rules concerning "tie-in" arrangements and other improper aftermarket practices alleged in the Sherman Act Complaint, favoring instead a flexible regulatory approach under its general anti-fraud provisions, now embodied in Regulation M.

In another example of the Commission's past consideration of the conduct at issue in this case, the SEC released the "Report Of The Securities And Exchange Commission Concerning The Hot Issues Markets" in August 1984 (the "Hot Issues Report"). In the Hot Issues Report, the SEC recognized that "[g]enerally, the abuses found in a hot issues market involve either artificial restrictions on supply or attempts to stimulate demand that facilitate a rapid rise in the price of the security." (Hot Issues Report at 29.) The Hot Issues Report recognized, however, that some artificial restrictions on supply and efforts to enhance demand are permissible under certain circumstances. (Hot Issues Report at 29 (noting that it is "important to distinguish the illegal abuse of legitimate practices from legal practices so as to not preclude legitimate actions").)

In the Hot Issues Report, the Commission noted that certain "tie-in arrangements" may violate Sections 9 and 10(b) of the Exchange Act, 15 U.S.C. § 78i & 78j(b), as well as Exchange Act Rule 10b–5, 17 C.F.R. § 240.10b–5, because they "stimulate[ ] demand for a hot issue in the aftermarket, thereby facilitating the process by which stock prices rise to a premium." (Hot Issues Report at 37–38.) However, the SEC noted that the improper conduct at issue in this case is recurrent in every "hot issue" cycle, and is adequately addressed by existing securities laws without the need to impose unnecessarily rigid limitations antithetical to the Commission's stated goals:

> Existing statutory authority provides the Commission with the necessary flexibility to adopt rules that address hot issues abuses. . . . *All of the abuses described in this Report are prohibited by the existing federal securities laws,* and the Commission periodically reviews its regulations to assure that they are current. . . . The Commission has maintained vigilant oversight over the hot issues markets and has effectively utilized its adequate statutory and rule-making authority to reach abuses. *The Commission has aggressively ferreted out fraudulent conduct and preserved the integrity of the markets while avoiding unnecessary restrictions on first-time issuers that may stifle creativity, deny essential financing to legitimate businesses, and deter legitimate conduct.*

(Hot Issues Report at 76–77, 81–82 (emphasis added).)

Further, when it proposed Regulation M to replace the trading practice rules, the SEC announced that it intended to gather information about aftermarket activities so that it could evaluate whether any additional regulation was necessary. For example, in their proposing release dated April 18, 1996, the Commission recognized

the necessity of some aftermarket manipulation by syndicate participants, and once again eschewed bright-line rules prohibiting all aftermarket manipulation in favor of a flexible approach:

> An underwriter's interest in the success of an offering does not necessarily end with the completion of the sales efforts and termination of formal stabilizing activities, but can extend into the "aftermarket" trading in the distributed security (in general, the period immediately following the termination of formal syndicate activity—the so-called "breaking of the syndicate"). Aftermarket participation may be an expected part of the underwriting services provided to an issuer, and the anticipated quality of such services can influence the issuer's selection of a managing underwriter. Underwriters also have an incentive to provide "support" in the aftermarket to counterbalance pressure on the security's price from "flipping" and other selling activity that could adversely affect the investors who have purchased in the offering. In addition, the managing underwriter often purchases shares in the aftermarket period to cover a syndicate short position. Accordingly, the point in time when underwriters no longer have the purpose to "facilitate an offering" cannot be identified with precision.

SEC Release No. 33–7283, 61 Fed.Reg. 17108, 17124 (April 11, 1996) (footnote omitted); *see also* SEC Release No. 33–7375, 62 Fed.Reg. 520, 537–38 (Jan. 3, 1997) ("[S]yndicate short covering transactions and the imposition of penalty bids by underwriters are activities that can facilitate an offering in a manner similar to stabilization . . . the Commission proposed, and has determined to adopt, the provisions relating to disclosure, notification, and recordkeeping of syndicate covering transactions and the imposition of penalty bids.").

### 2. The SEC's Current Consideration Of The Conduct At Issue

In its *amicus* submission, the SEC asserts that it not only considered "tie-in" arrangements and other aftermarket price activity in the past, but in fact is investigating the conduct at issue in this case for potential violations of existing statutes, regulations and rules concerning the price setting process and allocation practices of "hot issue" underwriters. (SEC *Amicus* Br. at 14 ("[T]he Division of Market Regulation has been conducting an ongoing review of certain aftermarket practices (*e.g.*, overselling, syndicate covering transactions, and penalty bids), in order to decide whether provisions of Regulation M adequately regulate syndicate underwriting practices and provide adequate protection to investors.").)

This ongoing review is embodied in a number of recent Commission and SRO activities. For example, the Commission requested that the NYSE and NASD appoint a "high-level group of business and academic leaders" to investigate whether additional rulemaking was required concerning "IPO allocation practices and the roles of issuers and underwriters in the price setting and offering process." *See* SEC Press Release No.2002–127, (Aug. 22, 2002), "Chairman Pitt Seeks Review Of Initial Public Offering Process," *available at* http://www.sec.gov/news/press/2002–127.htm. In addition, in the Final Report of the 2003 Conference on Federal–State Securities Regulation (the "2003 Report"), the Market Regulation working group report noted that "[t]he initial public offering underwriting process has come under a lot of scrutiny lately—especially with regard to perceived abuses in the pricing and allocation of IPO shares." Final Report of the 2003 Conference on Federal–State Securities Regulation, II.C.5 (June 2003), *available at* http://www.sec.gov/info/small-

bus/ffedst2003.htm. The 2003 Report notes that "Commission staff reported that it is currently reviewing industry practices regarding the roles of issuers and underwriters in the price setting and the allocation of IPO shares as well as the offering process in general." 2003 Report at C.5.[27]

The NASD is also actively reviewing the conduct at issue in this case in an attempt to determine what, if any, regulatory steps need to be taken. First, the NASD proposed, and the SEC is currently reviewing, Proposed Rule 2790 to replace NASD IM–2110–1, the Free Riding and Withholding Interpretation. SEC Release No. 34–46942 (Dec. 4, 2002). Proposed Rule 2790, titled "Trading in Hot Equity Offerings," was proposed to "focus and streamline [IM–2110–1], as well as to address feedback received in response to our request for comment on NASD rules in need of modernization in Notice to Members 98–81." SEC Release No. 34–46942, at II.A.1. The stated purpose of Proposed Rule 2790, like IM–2110–1, is to "to protect the integrity of the public offering process" by requiring all participants in an offering syndicate to make *bona fide* public distributions, not to withhold securities for their own benefit, and not to use allocation of securities to reward persons for future business. SEC Release No. 34–46942, at II.A.1.

In addition, the NASD sought comment from its members on whether "to create new Rule 2712 and amend existing Rule 2710 to prohibit certain IPO allocation abuses." *See* NASD Notice to Members No. 02–55: "Regulation of IPO Allocations and Distributions" (August 2002), *available at* http://www.nasdr.com/pdf-text/

0255ntm.pdf. The proposal would largely prohibit the conduct alleged by the Sherman Act Plaintiffs in this action, including:

the allocation of IPO shares as consideration or inducement for the payment of excessive compensation for other services provided by the member; the solicitation of aftermarket orders for the allocation of IPO shares; the allocation of IPO shares to an executive officer or director of a company on the condition that the officer or director send the company's investment banking business to the member, or as consideration for investment banking services previously rendered; and the imposition of a penalty on registered representatives whose retail customers have "flipped" IPO shares when similar penalties have not been imposed with respect to syndicate members.

NASD Notice No. 02–55. The NASD recognizes that the conduct addressed in this Proposed Rule is already largely prohibited by current SEC and NASD regulation, but is soliciting comment on the theory that the "new, specifically targeted provisions in Rule 2712 would aid member compliance efforts and help to maintain investor confidence in the capital markets." NASD Notice No. 02–55; *see also* Donaldson Testimony at Section V.B ("The NASD recently sought comment from its members on its proposed new rules regarding the regulation of IPO allocations and distributions. These rules are intended to better ensure that members avoid unacceptable conduct when they engage in the allocation and distribution of IPOs.").

---

27. *See also The Impact of the Global Settlement: Before the Sen. Comm. on Banking, Housing and Urban Affairs,* 108th Cong. 20, at Section V.B (2003) (testimony of Hon. William H. Donaldson, Chairman, SEC) ("Donaldson Testimony") ("In the months ahead, the Commission will continue to examine the IPO practices of the industry to determine whether further Commission or SRO action is necessary, including the possibility of revising existing rules or proposing new rulemaking.").

### 3. Enforcement Actions Based On The Conduct At Issue

In addition to considering new rules aimed at the conduct at issue in this case, the SEC's Division of Enforcement has brought injunctive actions alleging underwriter violations of current federal securities laws and NASD rules by broker-dealers engaging in conduct very similar, if not identical, to that alleged in the Sherman Act complaint.[28] Such active regulation of the conduct alleged in the Sherman Act Complaint militates strongly in favor of a finding of immunity under a *Gordon* analysis. *See Stock Exchanges Options*, 317 F.3d at 147.

### D. Implied Immunity And The Sherman Act Plaintiffs' Claims

In *Friedman* and *Stock Exchanges Options*, the Second Circuit clarified that the mere *potential* for conflict, determined by examining the scope of the SEC's regulatory power over the alleged behavior, satisfies the implied immunity doctrine's "plain repugnancy" requirement and mandates that immunity be granted. *See*

*Stock Exchanges Options*, 317 F.3d at 149; *Friedman*, 313 F.3d at 801. In this case, it is clear that the SEC, both directly and through its pervasive oversight of the NASD and other SROs, either expressly permits the conduct alleged in the Sherman Act Complaint or has the power to regulate the conduct such that a failure to find implied immunity would "conflict with an overall regulatory scheme that empowers the [SEC] to allow conduct that the antitrust laws would prohibit." *Stock Exchanges Options*, 317 F.3d at 149.

In its *amicus* submission, the NYAG acknowledges that "the Second Circuit's [*Stock Exchanges Options* ] decision might be read to suggest that implied immunity may be found whenever there is a potential conflict with a regulatory scheme, whether or not that potential materializes into actual conflict." (N.Y.AG *Amicus* Br. at 10–11.) Nevertheless, the NYAG urges this Court to reject that holding as "unsound as a matter of policy."[29] (N.Y.AG *Amicus* Br. at 11.) Since implied immunity in this action does not maroon the Sherman Act Plaintiffs, this Court does not

---

**28.** For example, in *SEC v. J.P. Morgan Securities Inc.*, No. 03 Civ. 02028 (D.D.C.), defendant J.P. Morgan Securities, Inc. ("JP Morgan") consented to entry of a final judgment permanently enjoining it from violating Rule 101 of Regulation M and NASD Rule 2110, and ordering it to pay a $25 million civil penalty, for conduct relating to IPO allocations it underwrote during 1999 and 2000. The Commission's complaint alleges that JP Morgan violated Rule 101 of Regulation M by, *inter alia*, attempting to induce certain customers to make aftermarket purchases during the restricted period through much of the same conduct alleged in the Sherman Act Complaint.

Similarly, in *SEC v. Robertson Stephens, Inc.*, No. 03 Civ. 0027 (D.D.C.), the Commission filed a civil action against broker-dealer Robertson Stephens, Inc. "relating to the firm's allocation of shares in Initial Public Offerings (IPOs) during 1999 and 2000." In its complaint, the Commission alleged that Robertson Stephens "wrongfully obtained

millions of dollars from over 100 customers by allocating shares of 'hot' IPOs to these customers and receiving, in return, profits— in the form of excessive commissions or markdowns—made by these customers on their IPO stock."

In addition, in *SEC v. Credit Suisse First Boston Corp.*, No. 1:02 Civ. 00090, 2002 WL 479836 (D.D.C. Jan.29, 2002), the district court approved and entered a consent judgment *permanently enjoining defendant* Credit Suisse First Boston Corp. ("CSFB") from violating certain NASD rules and SEC regulations. The SEC's complaint alleged that CSFB extracted "excessive commissions" from its customers through certain "pay to play" arrangements in which CSFB required its customers to share profits made by flipping IPO shares.

**29.** The Sherman Act Plaintiffs do not address the broader implications of the Second Circuit's language in *Stock Exchanges Options*.

share the NYAG's policy concern. The Sherman Act Plaintiffs' securities fraud claims survived a motion to dismiss in the parallel action, and this Court makes no judgment as to the relative merit of those claims. *See Initial Pub. Offering Sec. Lit.,* 241 F.Supp.2d at 399.

Undoubtedly, the SEC, the NASD, and other SROs will continue to study the conduct alleged, and enact changes to the current securities regulatory regime that are appropriate in consideration of the Commission's mandate to "balanc[e] the benefits of competition against its other regulatory aims." *In re Stock Exch. Options Trading Antitrust Litig.,* No. 1283, M–21–79(RCC), 99 Civ. 962(RCC), 2001 WL 128325, at *10 (S.D.N.Y.Feb. 15, 2001), *aff'd* 317 F.3d 134 (2d Cir.2003). Accordingly, the conduct alleged by the Sherman Act Plaintiffs is immune from the application of antitrust laws, and the Underwriter Defendants' motion to dismiss the Sherman Act Complaint's federal antitrust claims is granted.

### E. *State Antitrust Claims*

■ While Supreme Court and Second Circuit precedent do not address the doctrine of implied immunity as it relates to state antitrust laws, reason and common sense compel the conclusion that the same conduct that is immune from Sherman Act antitrust scrutiny must also be immune from state antritrust scrutiny. Any other outcome would eviscerate the implied immunity doctrine. To shield the securities regulatory regime from encroachment by the Sherman Act, only to expose that regime to assault by a swarm of state antitrust claims, would shatter the federal regulatory framework for national securities markets. *Cf. Stock Exchanges Options,* 2001 WL 128325, at *11 ("[b]ifurcating antitrust immunity according to the status of the defendant undoubtably would undermine this Court's holding. . . . If this were so, the application of antitrust immu-

nity would be rendered nugatory."). This Court will not countenance such a mischievous result. Accordingly, the Sherman Act Plaintiffs' state antitrust claims are also dismissed under the doctrine of implied immunity. As a result, the Underwriter Defendants' motion to dismiss the Sherman Act Complaint is granted.

### V. *The Robinson–Patman Act Complaint*

■ The Robinson–Patman Act Complaint, charging a violation of Section 2(c) of the Robinson–Patman Act, alleges nearly all of the same conduct described by the Sherman Act Plaintiffs in their complaint, but adds allegations of conduct by defendants that discouraged "flipping." (Robinson–Patman Act Compl. ¶¶ 64–71, 74–89.) In *Friedman,* the Second Circuit held that implied immunity from antitrust regulation was proper for broker-dealer conduct discouraging "flipping" of IPO shares because "allowing an antitrust lawsuit to proceed would conflict with Congress' implicit determination that the SEC should regulate the alleged anti-competitive conduct." 313 F.3d at 801. This Court agrees with the Second Circuit's determination in *Friedman* that practices designed to combat "flipping" are immune from antitrust scrutiny. For this reason, and those set forth earlier in this Memorandum and Order concerning the conduct alleged in the Sherman Act Complaint, this Court holds that implied immunity is warranted with respect to the Robinson–Patman Act Plaintiffs' claims. Accordingly, the Underwriter Defendants' motion to dismiss the Robinson–Patman Act Complaint is granted.

### CONCLUSION

For the reasons set forth above, the Underwriter Defendants' motion to dismiss this action on the grounds of implied immunity is granted, and both the Sherman Act Complaint and the Robinson–

Patman Act Complaint are dismissed with prejudice as against all defendants. The Clerk of Court is directed to mark this case closed.